## IN RE BABY GIRL B.
### (14591)
### (14592)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and NORCOTT, JS.

Argued October 1—decision released December 8, 1992

*William M. Bloss,* with whom was *Barbara J. Ruhe,* for the appellants in the first case (proposed intervenors).

*Richard Blumenthal,* attorney general, with whom were *Linda Pearce Prestley* and *Susan T. Pearlman,* assistant attorneys general, for the appellant in the second case (petitioner).

*Angelica Anaya-Allen,* with whom were *Shelley White* and, on the brief, *Linda Oechsle,* for the appellee in both cases (respondent mother).

*Sara R. Martin,* with whom was *Marion Fay,* for the minor child.

*Robert Whitman* and *Kelly A. Peters* filed a brief as amici curiae.

*JoNel Newman, Paul Chill, Tanina Rostain, Nancy Erickson, Laurie Woods* and *Alice Bussiere* filed a brief for the Connecticut Civil Liberties Union et al. as amici curiae.

PETERS, C. J. These appeals require us to find the proper accommodation between the statutory policy favoring finality in the termination of parental rights and the statutory policy favoring the opening of judgments in the interests of justice. The petitioner, the department of children and youth services (DCYS), filed coterminous petitions for a determination of neglect with respect to a two day old child pursuant to General Statutes § 46b-129[1] and for termination of parental rights on the ground of abandonment pursuant to General Statutes § 17a-112 (b) (1),[2] both premised on

---

[1] General Statutes § 46b-129 provides in relevant part: "COMMITMENT OF CHILD OR YOUTH. PETITION FOR NEGLECTED, UNCARED-FOR, DEPENDENT CHILD OR YOUTH. (a) . . . the commissioner of children and youth services . . . having information that a child or youth is neglected, uncared-for or dependent, may file with the superior court which has venue over such matter a verified petition plainly stating such facts as bring the child or youth within the jurisdiction of the court as neglected, uncared-for, or dependent . . . and praying for appropriate action by the court in conformity with the provisions of this chapter. . . ."

[2] General Statutes § 17a-112 provides in relevant part: "TERMINATION OF PARENTAL RIGHTS OF CHILD COMMITTED TO COMMISSIONER. . . .

"(b) The superior court upon hearing and notice, as provided in sections 45a-716 and 45a-717, may grant such petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that, with respect to any consenting parent, such parent has voluntarily and knowingly consented to termination of his parental rights with respect to such child or that, with respect to any nonconsenting parent, over an extended period of time, which, except as provided in subsection (c) of this section, shall not be less than one year: (1) The child has been abandoned by the parent in the sense that the parent has failed to main-

the fact that, within hours of giving birth, the child's mother had left the hospital without disclosing her identity or her whereabouts. The trial court, after appointing counsel for the child and giving notice by publication of the pending petitions, held a hearing and rendered a judgment granting the petitions. More than four months later, after the child had been placed in a preadoptive home, the mother moved to open the termination judgment. Despite the objection of DCYS, the trial court granted the mother's motion. The preadoptive parents moved to intervene in the proceedings regarding the motion to open, but their motion was

tain a reasonable degree of interest, concern or responsibility as to the welfare of the child; or (2) the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child; or (3) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights; or (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. If the court denies a petition for consent termination of parental rights, it may refer the matter to an agency to assess the needs of the child, the care the child is receiving, and the plan of the parent for the child. . . .

"(e) Any petition brought by the commissioner of children and youth services to the superior court, pursuant to subsection (a) of section 46b-129, may be accompanied by a petition for termination of parental rights filed in accordance with this section with respect to such child, notwithstanding that such child has not been committed to the commissioner of children and youth services. Notice of the hearing on such petitions shall be given in accordance with sections 45a-716 and 45a-717. The superior court, after hearing, in accordance with the provisions of subsection (b) of this section, may, in lieu of granting the petition filed pursuant to section 46b-129, grant the petition for termination of parental rights as provided in section 45a-717."

denied. Thereafter, DCYS filed an amended termination petition including additional grounds for termination of the mother's rights to her child. The trial court denied the amended petition to terminate the mother's parental rights.

There are two appeals before us. The first appeal is that of the preadoptive parents, who challenge the trial court's denial of their motion to intervene in the proceeding to determine whether the judgment of termination should be opened. The second appeal is that of DCYS, which challenges the trial court's authority to open the judgment of termination, the trial court's exercise of its discretion to open the judgment of termination, and the trial court's denial of the amended petition for termination. Both appeals were filed in the Appellate Court, and we transferred them to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

## I

The relevant facts are as follows. At the time that she gave birth to Baby Girl B., the respondent mother was an eighteen year old high school student living with her parents in Milford. She consistently denied that she had been aware of her pregnancy. On June 26, 1991, she was taken to the hospital by ambulance after fainting on a public street in West Haven where she had been visiting with a girlfriend. Distressed by the revelation that she was in active labor, and frightened about how her parents might react, she concealed her identity from hospital personnel. Following delivery, having briefly looked in on her child, the mother left the hospital on the evening of the child's birth. The child was in perfect health. Upon leaving the hospital, the mother returned home without telling anyone what had occurred. Anonymously, she called the hospital twice to inquire about the child's health. The second time she

was told to contact DCYS. Her efforts anonymously to elicit further information from DCYS were unsuccessful.

Upon discovering that the mother had left, the hospital staff notified DCYS concerning the child's situation. Two days after the child's birth, DCYS obtained an order of temporary custody and filed coterminous petitions relating to the child, one alleging neglect, pursuant to § 46b-129, and the other alleging that the mother had abandoned the child and that her parental rights should be terminated, pursuant to § 17a-112 (b) (1). DCYS arranged a placement for the child in a foster home.

Theresa Polverari, a DCYS intake worker, directed that the child be left at the hospital for an additional two days in the hope that the mother would return. Polverari also attempted to locate the mother by placing a call to the West Haven police asking them to trace any information they might have had about the mother. Polverari did not, however, investigate information contained in an affidavit of a hospital social work intern, Lisa Holme. Holme had identified by name, address and telephone number the person who had called 911 to obtain emergency service for the mother, and had included the 911 administrative telephone number that would have enabled a caller to hear the 911 tape of the conversation between the caller and the police. Polverari did not call either of these telephone numbers.

A hearing on the coterminous petitions for neglect and termination was scheduled for July 25, 1991. The mother received no actual notice of the filing of either of these petitions, although she was deemed to have received constructive notice thereof by publication in the New Haven Register on July 6, 1991, pursuant to

General Statutes § 45a-716 (c).[3] When the mother did not appear for the scheduled hearing, the trial court postponed it until July 31, 1991.

On July 31, 1991, the trial court held a hearing on the coterminous petitions. In the mother's absence, the court did not consider whether to appoint counsel on her behalf, although court-appointed counsel for the child participated in the proceedings. Polverari described the efforts that she had made to locate the mother. Patricia LeMay, a DCYS treatment worker, informed the court that the child had been placed in foster care and was eligible for adoption. At the conclusion of the hearing on July 31, 1991, the trial court granted the coterminous petitions for neglect and termination of parental rights, in which counsel for the child had acquiesced. The trial court found that it was in the child's best interest to waive the one year waiting period for termination of parental rights. See General Statutes § 17a-112 (c).[4] The trial court then appointed DCYS as the child's statutory parent and directed it to report to the court regarding the child's status within ninety days, and thereafter at six month intervals, "until adoption is accomplished." No objection was taken by any party to the court's retention of jurisdiction for this purpose. Notice of the court's decision was published in the New Haven Register on August 7, 1991.

On October 10, 1991, upon expiration of the appeal period following the judgment terminating the mother's parental rights, DCYS removed the child from her fos-

[3] General Statutes § 45a-716 provides in relevant part: "HEARING ON PETITION TO TERMINATE PARENTAL RIGHTS. NOTICE. . . .

"(c) . . . If the address of any person entitled to personal service is unknown . . . a judge or clerk of the court shall order notice to be given by . . . publication at least ten days before the date of the hearing. Any publication shall be in a newspaper of general circulation in the place of the last-known address of the person to be notified, whether within or without this state, or if no such address is known, in the place where the termination has been filed."

[4] General Statutes § 17a-112 (c) provides: "The court may waive the requirement that one year expire prior to the termination of parental rights

ter home and placed her with a couple who were on a list of approved prospective parents awaiting children for adoption. The preadoptive parents named and christened the child and took over every aspect of her care at their own expense. Relying on representations from DCYS that the child was not a "legal risk," they expected that the child would be removed from their custody only for cause arising out of neglect or abuse on their part.

One month later, less than four months after the termination judgment, the mother made contact with DCYS. Having told her parents on November 11, 1991, about the child's birth, the mother telephoned DCYS the next day and spoke to DCYS treatment worker LeMay. On November 14, 1991, LeMay visited the mother's home and met there with the mother and the child's maternal grandmother. LeMay's purpose in making the visit was, at least in part, to obtain genetic information to facilitate the child's adoption.[5]

In the interview at the mother's home, LeMay told the mother that her parental rights had been definitively terminated because the period to appeal from the judgment of termination had expired. LeMay explained that the child had been placed in an excellent adoptive home and that only the child, when she reached the age of eighteen, would have the right to make further contact in order to seek information about her genetic parents. LeMay had discussed with her DCYS supervisors what advice she should give to the mother. In conveying the view that the mother had no further legal recourse, LeMay's remarks were not intended to dissuade the mother from pursuing other legal rights that she might have had, because LeMay was unaware of their existence. Her advice was, nonetheless, misleading because the mother was not alerted to the urgency

if it finds from the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child."

[5] General Statutes § 45a-746 provides that adopting parents are entitled to receive genetic information about the child that they are adopting. Gen-

of taking action to seek to open the judgment terminating her parental rights. Upon hearing LeMay's advice, the maternal grandmother expressed immediate doubt about its validity and indicated that the mother would seek legal counsel. The maternal grandmother then ended the interview.

LeMay reported her interview with the mother to her supervisors but undertook no other immediate action or investigation. She did not inform counsel for the child that the mother had contacted DCYS. She did not disclose her conversation with the mother to the preadoptive parents for seven weeks, until January 2, 1992, because she did not want to "ruin their holidays."

The mother sought private legal counsel the day following her interview with LeMay. Because she could not afford private representation, she was referred to Legal Assistance. Through no fault of the mother's, there ensued a delay in arranging for a legal consultation. After consulting with counsel, she filed a motion to open the judgment pursuant to General Statutes § 52-212a[6] and Practice Book § 326[7] on December 16, 1991, four months and sixteen days after the rendering of the judgment terminating her parental rights.

The trial court heard numerous motions and took extensive evidence with regard to the contested motion to open judgment. The trial court ruled that: (1) the preadoptive parents were not entitled to intervene in

eral Statutes § 45a-748 imposes upon DCYS, as statutory parent, the duty "to make a reasonable effort to obtain the information provided for in section 45a-746 for each child being placed for adoption."

[6] General Statutes § 52-212a provides: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, a civil judgment or decree rendered in the superior court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered or passed. The parties may waive the provisions of this section or otherwise submit to the jurisdiction of the court."

[7] Because the statutory and the Practice Book provisions are, for present purposes, identical, we will refer hereafter only to General Statutes § 52-212a.

the proceedings relating to the motion to open;[8] (2) General Statutes § 17a-112 (i) conferred continuing jurisdiction on the trial court to open a judgment terminating parental rights prior to adoption; and (3) consideration of the relevant circumstances made it appropriate to open the judgment in this case. Several weeks later, the trial court entered an order permitting weekly visitation between the mother and the child.

Once the judgment had been opened, DCYS, without attempting to appeal therefrom[9] or otherwise expressly reserving its rights, moved to file an amended petition for termination of parental rights. Over the objection of the mother, DCYS was permitted to enlarge the grounds for termination to include, in addition to the original ground of abandonment, the grounds of absence of an on-going parent child relationship; General Statutes § 17a-112 (b) (4); and acts of commission or omission by the mother in the care of the child. General Statutes § 17a-112 (b) (3).[10] The trial court then held further evidentiary hearings concerning the conduct and the psychological resources of the mother. On the basis of this evidentiary showing, the trial court concluded that DCYS had failed to establish any ground for termination by clear and convincing evidence. It, therefore, rendered its judgment on the termination petition in favor of the mother.

The trial court considered the evidence offered with regard to the petition for the termination of parental rights in rendering its contemporaneous judgment con-

---

[8] In accordance with the subsequent agreement of all parties, the trial court ruled that the preadoptive parents would have the right to intervene in a dispositional hearing subsequent to an adjudication that the mother's parental rights be terminated.

[9] Even though the trial court's decision to open the judgment was not a final judgment, DCYS might have requested certification to appeal pursuant to General Statutes § 52-265a. See *State* v. *Ayala*, 222 Conn. 331, 341, 610 A.2d 1162 (1992).

[10] See footnote 2 for the text of General Statutes § 17a-112 (b).

cerning DCYS's coterminous petition for custody on the ground of neglect. In the adjudicative phase of that proceeding, the trial court concluded that DCYS had established that the mother had neglected the child. That same day, however, after further discussion between the parties, the court rendered a stipulated disposition of the neglect petition that provided for the return of the child to her mother, subject to the protective supervision of DCYS during the succeeding six months. Implicit in this disposition is the agreement of the parties that, at the time of the hearing, it was in the best interest of the child to be returned to her mother. The child has, accordingly, been returned to her mother's legal and physical custody and has resided with her mother since then.

The preadoptive parents did not participate in the stipulated disposition of the neglect petition because they had elected not to do so. Although notified of the date on which the dispositional hearing on the neglect petition would be held, and invited to appear, they had indicated repeatedly to DCYS that, if the petition for termination of parental rights were denied, they had no interest in taking on the role of mere foster parents. On July 8, 1992, after the mother had taken custody, they filed a motion to open the disposition of the neglect petition. Emphasizing their own emotional turmoil, they informed the court that they had changed their mind about their willingness and ability to resume custody of the child even if there was a question about the permanency of the placement of the child with them. DCYS filed a similar motion for modification of the child's custody. After a hearing, the trial court denied both motions on July 14, 1992.

On appeal, the preadoptive parents have challenged the validity of the ruling denying their right to intervene in the proceedings on the motion to open the judgment terminating the mother's parental rights. DCYS

has challenged the authority of the trial court to open the judgment, the propriety of its exercise of that authority, and the validity of its rulings on the merits of the petition for termination of parental rights. Neither the preadoptive parents nor DCYS has raised any issue concerning the trial court's order, on the neglect petition, returning the child to the custody of the mother.

## II

The preadoptive parents, who are the appellants in Docket No. 14591, maintain that the judgment in favor of the mother should be set aside because they were improperly denied the right to intervene in the proceedings in which the mother sought to open the judgment that had terminated her parental rights. They contend that they were entitled to intervene as a matter of right or, alternatively, that the trial court abused its discretion in denying their motion to intervene.[11] We are not persuaded by either contention.

## A

We do not write on a clean slate in deciding the propriety of intervention as a matter of right by interested third parties in the termination of parental rights. Because the issue to be resolved in a termination proceeding is narrowly focused on the parent or parents whose parental rights are at stake; see General Statutes § 17a-112 (b) (statutory criteria for termination of

---

[11] Practice Book § 99 governs mandatory intervention. It provides in relevant part: "If a person not a party has an interest or title which the judgment will affect, the court, on his motion, shall direct him to be made a party."

Practice Book § 99 also governs permissive intervention. It provides in relevant part: "The court may determine the controversy as between the parties before it, if it can do so without prejudice to the rights of others; but, if a complete determination cannot be had without the presence of other parties, the court may direct that they be brought in." General Statutes § 52-107 contains essentially the same provisions as Practice Book § 99.

parental rights); our cases have established that parties interested in the prospective adoption have no right to intervene in the termination proceeding. "It is . . . essential, in considering a petition to terminate parental rights, to sever completely the issues of whether termination is statutorily warranted and whether a proposed adoption is desirable. Although petitions for termination are presumably seldom brought unless prospective adoptive parents are available, there still must be a two-step process to determine, first, the threshold question of whether cause for termination . . . has been proved." *In re Juvenile Appeal (Anonymous)* v. *Commissioner of Children & Youth Services,* 177 Conn. 648, 673, 420 A.2d 875 (1979); see also *Matter of Corey L* v. *Martin L,* 45 N.Y.2d 383, 391, 380 N.E.2d 266, 408 N.Y.S.2d 439 (1978). Accordingly, we have held that "[o]nly if a ground for termination exists may the suitability and circumstances of adoptive parents, in an appropriate proceeding, be considered." *In re Juvenile Appeal (Anonymous),* 181 Conn. 638, 645, 436 A.2d 290 (1980).

The preadoptive parents' reliance on *Horton* v. *Meskill,* 187 Conn. 187, 445 A.2d 579 (1982), in support of their right to intervene is unavailing. In that case, we held that Practice Book § 99 affords a right to intervene when the applicant "will either gain or lose by the direct legal operation and effect of the judgment." (Internal quotation marks omitted.) Id., 195. We cautioned, however, that "a person or entity does not have a sufficient interest to qualify for the right to intervene merely because an impending judgment will have some effect on him, her, or it. The judgment to be rendered must affect the proposed intervenor's direct or personal rights, not those of another." Id. Here, the only legal interests at stake in the termination proceeding were the mother's parental rights. Although the preadoptive parents may have been

affected by the court's judgment in the termination proceeding, they had no legal interest at stake that would entitle them to intervene.

The preadoptive parents argue further, however, that due process requires that they be allowed to intervene in the termination proceeding because they have constitutionally protected liberty interests in "maintaining custody," "preserving their own family unit in its pre-adoptive situation," and "preserving the judgment terminating the biological mother's parental rights." They assert that our precedents denying foster parents the right to intervene in termination proceedings are distinguishable because these liberty interests give them, as preadoptive parents, a different legal status than foster parents.

Even if we assume, arguendo, that preadoptive parents occupy a different legal status than foster parents, this difference is not significant with respect to the right to intervene in the adjudication of a petition to terminate parental rights. At best, such differentiated status may be significant with regard to issues relating to the future disposition of the child, such as custody and removal of the child from the prospective adoptive home.[12] See, e.g., *Thelen* v. *Catholic Social Services,* 691 F. Sup. 1179, 1185 (E.D. Wis. 1988) (in a challenge to the removal of a prospective adoptive child from the preadoptive home, preadoptive parents, unlike foster parents, have a limited, legitimate constitutional interest in maintaining custody of the child); *In re B.G.,* 11 Cal. 3d 679, 692, 523 P.2d 244, 114 Cal. Rptr. 444 (1974) (a "de facto parent" who has "assume[d] the role of parent, raising the child in his own home" may intervene in a dispositional hearing regarding the child).

---

[12] We note again that the trial court ruled that the preadoptive parents could intervene in the dispositional stage of the proceedings if the mother's parental rights were terminated.

When the issue is the validity of the termination of a parent's rights to her child, however, we continue to adhere to the sharp line drawn between the adjudication of termination of parental rights and the future disposition of the child for purposes of determining whether foster or preadoptive parents are entitled to intervene. See, e.g., *In the Interest of V.F.*, 490 N.W.2d 87 (Iowa App. 1992) (preadoptive parents do not have standing to challenge state's refusal to seek termination of parental rights of natural parent). Accordingly, the trial court properly denied the preadoptive parents' motion to intervene in the termination proceeding as a matter of right.

## B

We are equally persuaded that the trial court did not abuse its discretion in denying the preadoptive parents' request for permissive intervention. Because questions of permissive intervention are committed to the sound discretion of the trial court, the preadoptive parents bear the heavy burden of demonstrating an abuse of that discretion if they are to prevail. *Milford* v. *Local 1566,* 200 Conn. 91, 94, 510 A.2d 177 (1986); *Horton* v. *Meskill,* supra, 197.

Our cases establish that, in determining whether to grant a request for permissive intervention, a court should consider several factors: the timeliness of the intervention, the proposed intervenor's interest in the controversy, the adequacy of representation of such interests by other parties, the delay in the proceedings or other prejudice to the existing parties the intervention may cause, and the necessity for or value of the intervention in resolving the controversy. *Milford* v. *Local 1566,* supra; *Horton* v. *Meskill,* supra. "A ruling on a motion for permissive intervention would be erroneous only in the rare case where such factors weigh

so heavily against the ruling that it would amount to an abuse of the trial court's discretion." *Milford* v. *Local 1566,* supra.

We hold that the trial court's denial of the preadoptive parents' request for permissive intervention was not an abuse of discretion because the denial struck a proper balance between the relevant factors. With respect to the intervention of foster parents in termination proceedings, this court has determined that "[t]he intervention of foster parents as parties at the termination stage will permit them to shape the case in such a way as to introduce an impermissible ingredient into the termination proceedings. Petitions for termination of parental rights are particularly vulnerable to the risk that judges or social workers will be tempted, consciously or unconsciously, to compare unfavorably the material advantages of the child's natural parents with those of prospective adoptive parents and therefore to reach a result based on such comparisons rather than on the statutory criteria." (Internal quotation marks omitted.) *In re Juvenile Appeal (Docket No. 10718),* 188 Conn. 259, 262–63, 449 A.2d 165 (1982). Similarly, the intervention of the preadoptive parents in the termination proceeding might have led to the introduction of impermissible and prejudicial factors. Moreover, because the termination proceeding was concerned only with the statutory criteria alleged as grounds for terminating the mother's parental rights, the preadoptive parents' intervention would have been of little or no value to the court's decision on whether the grounds for termination had been proved. We hold, therefore, that the trial court did not abuse its discretion in denying the preadoptive parents' request for permissive intervention.

### III

DCYS, the appellant in Docket No. 14592, maintains that the judgment of the trial court should be set aside

for three reasons. DCYS contends that the trial court: (1) had no authority to open the initial judgment terminating the mother's parental rights; (2) if it had the authority, abused its discretion in opening that judgment; and (3) if it properly opened the judgment, improperly denied the amended petition for termination of parental rights. We disagree with each of these contentions.

## A

Before addressing the validity of the specific trial court rulings that DCYS has called into question, we must restate the well established principles that generally govern the termination of parental rights. General Statutes (Rev. to 1989) § 45-61b (g), now codified as § 45a-707 (g), defines the termination of parental rights as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his or her parent. "It is, accordingly, a most serious and sensitive judicial action. *Anonymous* v. *Norton,* 168 Conn. 421, 430, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975). Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection. *Stanley* v. *Illinois,* 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); see also *In re Juvenile Appeal (83-CD),* 189 Conn. 276, 295, 455 A.2d 1313 (1983) (noting that it is both a fundamental right and the policy of this state to maintain the integrity of the family). Termination of parental rights does not follow automatically from parental conduct justifying the removal of custody. The fundamental liberty interest of natural parents in the care, custody, and management of their child does not

evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. *Santosky* v. *Kramer,* 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)." (Internal quotation marks omitted.) *In re Jessica M.,* 217 Conn. 459, 464-65, 586 A.2d 597 (1991).

It bears emphasis that a judicial termination of parental rights may not be premised on a determination that it would be in the child's best interests to terminate the parent's rights in order to substitute another, more suitable set of adoptive parents. "Our statutes and caselaw make it crystal clear that the determination of the child's best interests comes into play only *after* statutory grounds for termination of parental rights have been established by clear and convincing evidence." (Emphasis in original.) *In re Valerie D.,* 223 Conn. 492, 511, 613 A.2d 748 (1992); *In re Jessica M.,* supra, 466. "[A] parent cannot be displaced because 'someone else could do a "better job" of raising the child. . . .' " *Matter of Corey L* v. *Martin L,* supra, 391; *In re Jessica M.,* supra, 467; see comment, "The 'Two-Pronged' Inquiry — The Best Alternative for the Conflicting Rights Involved in Proceedings for Termination of Parental Rights," 13 Conn. L. Rev. 709 (1981).

Although, as a matter of statutory fiat, consideration of the best interests of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination of parental rights; *In re Barbara J.,* 215 Conn. 31, 45, 574 A.2d 203 (1990); *In re Luis C.,* 210 Conn. 157, 165, 554 A.2d 722 (1989); *In re Juvenile Appeal (Anonymous)* v. *Commissioner of Children & Youth Services,* supra, 671-72; "[i]nsistence upon strict compliance with the statutory criteria

before termination . . . can occur is not inconsistent with concern for the best interests of the child." *In re Juvenile Appeal (Anonymous)* v. *Commissioner of Children & Youth Services,* supra, 672. "A child, no less than a parent, has a powerful interest in the preservation of the parent-child relationship. *Santosky* v. *Kramer,* supra, 760." *In re Jessica M.,* supra, 466.

## B

Emphasizing the finality that attaches to a termination of parental rights, DCYS maintains that the trial court had no authority whatsoever to open the judgment of termination. DCYS advances two versions of this contention. DCYS argues, first, that no judgment of termination may ever be opened by any court, under any circumstances, after the expiration of the time to appeal from the initial judgment. Under this theory, § 52-212a is inapplicable to judgments terminating parental rights, so that the trial court could not have entertained a motion to open a termination judgment even within four months of the judgment.[13] DCYS contends, alternatively, that the trial court did not have continuing jurisdiction to open the judgment of termination after expiration of the four month period prescribed by § 52-212a.

## 1

DCYS bases its argument that termination of parental rights judgments may never be opened, once the twenty day appeal period has expired, on the proposition that termination proceedings are statutory actions that are sui generis and, thus, are not civil actions within the compass of § 52-212a. In support of this proposition, DCYS attaches significance to the form

[13] The mother notes, as the relevant transcripts indicate, that DCYS advances this argument for the first time on appeal. Because of the importance of the issue, we will nonetheless review its merits in the exercise of our appellate discretion to do so. Cf. Practice Book § 4185.

of the pleadings in termination cases, in which the proceeding is begun by a "petition," rather than by a "complaint" and a respondent replies by a "plea," rather than by an "answer." DCYS further contends that a termination petition is not an ordinary civil action because it involves more than two parties and requires grounds for termination to be established by clear and convincing evidence. Finally, DCYS emphasizes that termination proceedings differ from civil actions because of the importance of finality to the public policy of assuring stable familial relationships for children.

We are unpersuaded by DCYS's formal argument that a proceeding to terminate parental rights is not a civil action to which § 52-212a applies. As the mother aptly observes, our statutes expressly denominate termination of parental rights proceedings as "juvenile matters"; General Statutes § 46b-121; and expressly contemplate that judgments in juvenile matters may be subject to motions to open. General Statutes § 52-259c. It has never been a defining characteristic of a civil action that it be limited to two parties or that the prevailing standard of proof be a preponderance of the evidence. The Appellate Court has, furthermore, impliedly recognized, in *In re Juvenile Appeal (84-1)*, 1 Conn. App. 298, 301, 471 A.2d 662 (1984), that a trial court has the statutory power to open a judgment terminating parental rights.

The public policy argument raised by DCYS stands on a different footing. DCYS emphasizes that the legislature enacted reforms to the termination and adoption laws in 1973 that were intended to foster stable and permanent parental relationships so as to protect the best interests of a child. In contrast with the former practice of interlocutory judgments, these statutory amendments prescribed procedures for the complete and final severance of parental rights and for the prompt appointment of DCYS as the statutory parent

so as to effectuate a greater degree of finality in adoptions.[14] DCYS asks us to conclude, because of this history, that the trial court had no authority, once the appeal period had run, to reexamine the merits of the judgment terminating the mother's parental rights.

So all encompassing an argument for finality in termination of parental rights cannot be sustained. As a matter of statutory construction, the generic characterization of a judgment as final does not remove it from the scope of § 52-212a. The statute applies without limitation to any "civil judgment or decree rendered in the superior court" and has, in other instances, been invoked by a party seeking to open a judgment that is final. See, e.g., *Pantlin & Chananie Development Corporation* v. *Hartford Cement & Building Supply Co.,* 188 Conn. 253, 258–59, 449 A.2d 162 (1982). DCYS acknowledged, furthermore, at oral argument, that even a final judgment terminating parental rights could be opened upon a showing of fraud. Courts have intrinsic powers, independent of statutory provisions authorizing the opening of judgments, to vacate any judgment obtained by fraud, duress or mutual mistake. See *Kenworthy* v. *Kenworthy,* 180 Conn. 129, 131, 429 A.2d 837 (1980); see also *Steve Viglione Sheet Metal Co.* v. *Sakonchick,* 190 Conn. 707, 710, 462 A.2d 1037 (1983). We are persuaded, therefore, that the mere "finality" of judgments terminating parental rights

[14] Regarding the statutory scheme governing termination of parental rights and subsequent adoption, the legislature's discussion surrounding the enactment included an emphasis on finality: "As to finality . . . the bill eliminates the rendering of interlocutory decrees, that is, decrees which are temporary in nature and may later be changed. Now the court must enter a final decree if the adoption is for the best interest of the child. . . . The statutory parent concept [included in the bill] also means that the rights of a natural parent will terminate at an earlier [st]age in the proceeding, that is, in the first step. Under the present law, the natural parent's rights do not terminate until the adoption decree." 16 S. Proc., Pt. 3, 1973 Sess., pp. 1434–35, remarks of Senator George C. Guidera.

does not automatically operate to exclude such judgments from the court's statutory authority to open judgments under § 52-212a.

The argument that DCYS advances thus devolves more appropriately into the contention that there is a specific conflict of policy between §§ 17a-112 and 45a-707 (g), which provide for finality in adjudication of petitions for the termination of parental rights, and § 52-212a, which provides for continuing jurisdiction to open judgments in civil actions. DCYS urges us to resolve this conflict of policy by construing § 52-212a to exclude termination judgments.

Our assessment of this argument of statutory construction must start with a clear understanding of the scope and the purpose of § 52-212a. We begin by considering General Statutes § 52-212,[15] upon which the trial court relied as furnishing the relevant grounds for granting this motion under § 52-212a. Section 52-212 requires a party moving for the opening of a judgment to make a two part showing that: (1) a good defense existed at the time an adverse judgment was rendered; and (2) the defense was not at that time raised by reason of "mistake, accident or other reasonable cause." *Pantlin & Chananie Development Corporation* v. *Hartford Cement & Building Supply Co.*, 196 Conn. 233, 235, 492 A.2d 159 (1985); *Eastern Elevator Co.* v. *Scalzi*, 193 Conn. 128, 131, 474 A.2d 456 (1984). Although

---

[15] General Statutes § 52-212 provides in relevant part: "(a) Any judgment rendered or decree passed upon a default or nonsuit in the superior court may be set aside, within four months following the date on which it was rendered or passed, and the case reinstated on the docket, on such terms in respect to costs as the court deems reasonable, upon the complaint or written motion of any party or person prejudiced thereby, showing reasonable cause, or that a good cause of action or defense in whole or in part existed at the time of the rendition of the judgment or the passage of the decree, and that the plaintiff or defendant was prevented by mistake, accident or other reasonable cause from prosecuting the action or making the defense."

§ 52-212a, therefore, does not authorize the opening of a judgment at will,[16] it does authorize the opening of a judgment in some cases in which a claim has been adjudicated against a defendant in his or her absence. The statute thus embodies a remedial policy articulated, as a common law matter, more than 100 years ago in *Schoonmaker* v. *Albertson & Douglass Machine Co.*, 51 Conn. 387, 392 (1883): "The law condemns no man unheard. It takes from him no property and deprives him of no right without giving him a day in court. He may waive his opportunity to appear and defend, or forfeit his right to a hearing by negligence, but not ordinarily by inadvertence or misfortune."

As a remedial statute that is grounded in a continuing commitment to common law principles of fairness and justice, § 52-212a does not readily lend itself to implied exceptions. In a case involving a disputed mechanic's lien, we held, therefore, that there was no conflict between § 52-212's conferral of continuing jurisdiction on a court to open a default judgment and the legislative policy commanding speedy resolution of mechanic's lien contests. *Pantlin & Chananie Development Corporation* v. *Hartford Cement & Building Supply Co.*, supra, 188 Conn. 258–59.

We determine, for three reasons, that it is equally inappropriate, in the circumstances of this case, to conclude that there is a conflict between § 52-212a and the legislative policy of commanding speedy resolution of

---

[16] We need not decide, in this case, whether the trial court took an unnecessarily restricted view of its authority to open a judgment under General Statutes § 52-212a. In the absence of a specification of grounds under § 52-212a, the Appellate Court has ruled that the relevant grounds are those specified in General Statutes § 52-212. See *Solomon* v. *Keiser,* 22 Conn. App. 424, 426–27, 577 A.2d 1103 (1990); *Noethe* v. *Noethe,* 18 Conn. App. 589, 595–96, 559 A.2d 1149 (1989). Arguably, the discretion conferred upon the court by § 52-212a is not so limited. See *Cichy* v. *Kostyk,* 143 Conn. 688, 696–97, 125 A.2d 483 (1956); 2 E. Stephenson, Connecticut Civil Procedure (2d Ed. 1971) § 207.

parental rights litigation derived from § 17a-112 (b). First, from the viewpoint of § 52-212a, we do not believe that the legislature would have intended to provide greater judicial oversight to correct defaults arising out of "inadvertence and misfortune" in actions involving *property* interests (such as mechanic's liens) than in actions involving *liberty* interests. Second, from the viewpoint of § 17a-112 (b), the legislative preference for postponement of any termination of parental rights until a failure in parenting has existed for an extended period of time of "not . . . less than one year" counsels against finding a conflict with a procedure for further judicial scrutiny, at least when, as here, the motion to open the termination judgment is filed before the expiration of the one year period. Third, from the viewpoint of the liberty interest of a natural parent in the care, custody and management of her child; see *Santosky* v. *Kramer,* supra, 753; fundamental constitutional rights are safeguarded by a construction of § 52-212a that affords a fair opportunity to present a meritorious defense, or otherwise to permit an appropriate exercise of judicial discretion, with regard to a judgment terminating parental rights. See *Stanley* v. *Illinois,* supra, 658; *In re Alexander V.,* 223 Conn. 557, 566, 613 A.2d 780 (1992); *In re Jessica M.,* supra, 464–65; *In re Juvenile Appeal (83-CD),* supra, 295. "In choosing between two statutory constructions, one valid and one constitutionally precarious, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." (Internal quotation marks omitted.) *McCarthy* v. *Commissioner of Correction,* 217 Conn. 568, 580, 587 A.2d 116 (1991); *State* v. *Breton,* 212 Conn. 258, 269, 562 A.2d 1060 (1989); *McConnell* v. *Beverly Enterprises-Connecticut, Inc.,* 209 Conn. 692, 706, 553 A.2d 596 (1989); *Moscone* v. *Manson,* 185 Conn. 124, 128, 440 A.2d 848 (1981); *Kron* v. *Thelen,* 178 Conn. 189, 197, 423 A.2d 857 (1979).

We conclude, therefore, that a judgment on a petition for termination of parental rights is a civil judgment for the purposes of § 52-212a. Even after the expiration of the appeal period, the trial court has continuing jurisdiction, within the authority conferred by § 52-212a, to open a judgment terminating such parental rights.

2

DCYS contends, in the alternative, that the mother in this case cannot avail herself of the trial court's continuing jurisdiction over judgments terminating parental rights because she has not complied with the time limitations contained in § 52-212a. The statute ordinarily requires a motion to open to be filed "within four months following the date on which [the judgment] was rendered." DCYS maintains that the mother's motion was not timely and that the court, therefore, did not have continuing jurisdiction to entertain it.

The factual predicate for DCYS's argument is undisputed. The trial court rendered its judgment terminating the mother's rights on July 31, 1991. The mother did not file her motion to open the judgment until December 16, 1991, four months and sixteen days after the rendering of the judgment.

The trial court concluded that § 17a-112 (i)[17] gave it continuing jurisdiction to consider the motion to open. Once a petition for termination of parental rights has been granted, this subsection requires the court-appointed guardian or statutory parent to file regular

---

[17] General Statutes § 17a-112 (i) provides: "In the case where termination of parental rights is granted, the guardian of the person or statutory parent shall report to the court within ninety days on a case plan, as defined by the Federal Child Welfare Act of 1980, for the child. At least every twelve months thereafter, the department of children and youth services shall make a report to the court on the implementation of the plan. Subsequent to the report the court shall review the plan for the child at least once a year until such time as any proposed adoption plan has become finalized."

reports for review by the court "until such time as any proposed adoption plan has become finalized." In this case, at the time of the judgment terminating the mother's rights, the trial court, with the consent of DCYS and counsel for the child, had expressly retained jurisdiction for the filing and review of such reports. The trial court did not consider whether, in the absence of such continuing jurisdiction, the filing of an amended petition for termination of parental rights by DCYS would constitute a waiver of the four month limitation contained in § 52-212a.

Before we undertake our analysis of DCYS's disagreement with the trial court's jurisdictional ruling, it is important to clarify that the jurisdictional issue relates not to jurisdiction over the subject matter but to jurisdiction over the person. The statutory requirement that a motion to open a judgment be filed within a limited period of time "arises from the common law rule concerning jurisdiction over the parties. . . . [Accordingly, the] jurisdiction which terminates at the end of the term is jurisdiction over the parties, not jurisdiction over the judgment." 2 E. Stephenson, Connecticut Civil Procedure (2d Ed. 1971) § 207 (d), p. 860; see also *Foley* v. *Douglas & Bros., Inc.,* 121 Conn. 377, 380, 185 A. 70 (1936); *Ruggiero* v. *Ruggiero,* 35 Conn. Sup. 581, 587, 399 A.2d 187 (1978). The express inclusion in § 52-212a of a provision that the parties may waive the four month limitation underscores the fact that the statute deals with personal and not with subject matter jurisdiction. It is hornbook law that "[s]ubject matter jurisdiction, unlike jurisdiction of the person, cannot be created through consent or waiver." *Castro* v. *Viera,* 207 Conn. 420, 429–30, 541 A.2d 1216 (1988); see *Demar* v. *Open Space & Conservation Commission,* 211 Conn. 416, 424, 559 A.2d 1103 (1989).

DCYS argues that the trial court was mistaken, for two reasons, in its reliance on § 17a-112 (i) as a source

of such continuing jurisdiction over DCYS. DCYS contends that this subsection should not be read as a substantive grant of jurisdiction because the sole legislative purpose sought to be achieved through enactment of the subsection was state compliance with federal requirements in order to entitle the state to receive federal child services funds. In the alternative, DCYS contends that the subsection contemplates continuing jurisdiction only over preadoptive procedures, and not over the opening of terminations of parental rights. We agree with the latter contention.

It is undisputed that the legislature enacted § 17a-112 (i) in order to take advantage of funding available to the states upon compliance with the Federal Adoption Assistance and Child Welfare Act of 1980. 42 U.S.C. § 670 et seq. The federal act "provide[s] the states with fiscal incentives to encourage a more active and systematic monitoring of children in the foster care system." *State of Vermont Department of Social & Rehabilitation Services* v. *United States Department of Health & Human Services,* 798 F.2d 57, 59 (2d Cir. 1986), cert. denied, 479 U.S. 1064, 107 S. Ct. 950, 93 L. Ed. 2d 999 (1987). The fact that federal incentives contribute to the enactment of state legislation does not, however, remove the ensuing legislation from the normal rules of statutory construction that govern its relationship to other legislative enactments and to applicable constitutional principles. See *Perry* v. *Perry,* 222 Conn. 799, 806–16, 611 A.2d 400 (1992). That fiscal incentives are an important part of the legislative history of § 17a-112 (i) sheds no useful light, therefore, on the jurisdictional inferences to be drawn from its provisions.

The more difficult question is to discern the purpose for which § 17a-112 (i) confers continuing jurisdiction on the court over DCYS as a statutory parent subsequent to a termination of parental rights. On the one

hand, this subsection appears as part of a section dealing broadly with the termination of parental rights regarding any child committed to DCYS. On the other hand, the subsection imposes on DCYS the obligation, once a termination of parental rights has been granted, to prepare a case plan and to submit periodic reports "until such time as any proposed *adoption* plan has become finalized." (Emphasis added.) In accordance with the requirements of federal law, the subsection requires dispositional hearings to assure permanent placements for children previously freed for adoption. *State of Vermont Department of Social & Rehabilitation Services* v. *United States Department of Health & Human Services,* supra, 64. It is significant, furthermore, that, in contrast to General Statutes § 46b-86,[18] which expressly confers continuing jurisdiction on the Superior Court over orders of support and custody, no subsection of § 17a-112 contains parallel language expressly authorizing continuing jurisdiction over judgments terminating parental rights. See *In re Ralph M.,* 211 Conn. 289, 306–307, 559 A.2d 179 (1989). As written, § 17a-112 (i) is consistent with the legislative decision to make a clear distinction between the termination of parental rights and the placement of a child for adoption. We conclude, therefore, that § 17a-112 (i)'s conferral of continuing jurisdiction over preadoption proceedings does not automatically confer continuing

[18] General Statutes § 46b-86 provides in relevant part: "MODIFICATION OF ALIMONY OR SUPPORT ORDERS AND JUDGMENTS. (a) Unless and to the extent that the decree precludes modification, any final order for the periodic payment of permanent alimony or support or an order for alimony or support pendente lite may at any time thereafter be continued, set aside, altered or modified by said court upon a showing of a substantial change in the circumstances of either party or upon a showing that the final order for child support substantially deviates from the child support guidelines established pursuant to section 46b-215a unless there was a specific finding on the record that the application of the guidelines would be inequitable or inappropriate. . . ."

jurisdiction over proceedings for the termination of parental rights. See *Bunche* v. *Bunche,* 180 Conn. 285, 288–89, 429 A.2d 874 (1980).

The absence of continuing jurisdiction over DCYS as a general matter under § 17a-112 (i) does not, however, determine whether the trial court acquired personal jurisdiction over DCYS by waiver or consent. The mother argues that DCYS waived its objection to the untimeliness of her motion to open by filing an amended petition for termination of her parental rights. We agree.

The record reveals that the trial court granted the mother's motion to open the judgment terminating her parental rights on March 24, 1992. As of that time, DCYS had not waived the four month limitation provision of § 52-212a. It took no further relevant action with regard to the trial court's decision to open the termination judgment until April 14, 1992, when it filed a motion to amend its coterminous petitions by adding two additional grounds for the termination of the mother's parental rights. On that day, despite the mother's objection to the broadening of the issues that would have to be considered, the trial court granted DCYS's motion to amend. The amended petition alleged that the mother had not only abandoned her child under § 17a-112 (b) (1), as previously charged, but had also failed to provide the child with necessary care, guidance and control under § 17a-112 (b) (3) and had failed to develop an ongoing parent-child relationship with the child under § 17a-112 (b) (4). It is significant, for present purposes, that the new grounds for termination relied on additional evidence about the conduct of the mother and her relationship to the child that postdated the original petition. In the evidentiary hearings held pursuant to the amended petition, the parties presented extensive testimony concerning events that had

transpired between July 31, 1991, the date of the hearing on the original petition, and April 14, 1992, the date of the amended petition.

Our cases have recognized that a party may waive its objection to a trial court's erroneous exercise of personal jurisdiction if that party "generally appears in the case and actively prosecutes the action or contests the issues." *Foley* v. *Douglas & Bros., Inc.,* supra, 380; *Receivers Middlesex Banking Co.* v. *Realty Investment Co.,* 104 Conn. 206, 214, 132 A. 390 (1926); see also *Cichy* v. *Kostyk,* 143 Conn. 688, 696–97, 125 A.2d 483 (1956); *Ferguson* v. *Sabo,* 115 Conn. 619, 623, 162 A. 844 (1932). There can be no waiver, however, if the party being haled into court "[f]ar from consenting to or waiving objection to [the court's] action . . . advance[s] strenuous opposition to it and steadfastly maintain[s] that position thereafter." *Lake Garda Co.* v. *Lake Garda Improvement Assn.,* 156 Conn. 61, 65, 238 A.2d 393 (1968).

We agree with the mother that DCYS waived its objection to the trial court's exercise of continuing jurisdiction by filing its amended petition without an express reservation of its objection. There would have been no waiver if DCYS had relied in the adjudicative phase of the termination proceedings only on the ground of abandonment that it had originally alleged. *Ferguson* v. *Sabo,* supra, 623. In this case, however, by electing to file an amended petition on new grounds, relying on allegations of new facts not previously in evidence, DCYS submitted to the jurisdiction of the court.

DCYS counters that it had a statutory obligation to present to the trial court the totality of the circumstances that related to the mother's conduct. Even assuming that DCYS does have such an obligation, we nonetheless conclude that its duties as statutory parent do not enable it to proceed as a petitioner in our

courts without conferring personal jurisdiction on the court to assess the merits of its claims. Although not every amendment to the pleadings would necessarily result in a waiver of objection to jurisdiction; e.g., *Nowak* v. *Nowak,* 175 Conn. 112, 122, 394 A.2d 716 (1978); the pervasive nature of the amendment in this case persuades us that DCYS waived its objection to the trial court's exercise of personal jurisdiction.

Before a petition for the termination of parental rights may be granted, our statute requires DCYS to prove, by clear and convincing evidence, that one of the specified statutory bases for termination has been established. General Statutes § 17a-112 (b). Each statutory basis is an independent ground for termination. See *In re Juvenile Appeal (84-BC),* 194 Conn. 252, 258, 479 A.2d 1204 (1984); *In re Juvenile Appeal (83-BC),* 189 Conn. 66, 69, 454 A.2d 1262 (1983). The statute does not permit the termination of parental rights on the basis of a generic all encompassing finding that termination is in the best interest of the child. *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 672, 420 A.2d 875 (1979); *In re Juvenile Appeal (84-3),* 1 Conn. App. 463, 467, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). In light of these well established principles, the addition of a new statutory ground for termination on a materially different factual basis constitutes a request for new affirmative relief. Even taking into account changes in modern rules of pleading, when DCYS sought such affirmative relief, it "must be held to have subjected [itself] voluntarily to the court's jurisdiction." *Receivers Middlesex Banking Co.* v. *Realty Investment Co.,* supra, 214. This result does no violence to DCYS's supervisory obligations. From a jurisdictional point of view, it makes no difference whether DCYS chooses to honor its obligation by filing an amended petition or by filing a second independent peti-

tion alleging new grounds for termination.[19] In either case, the nature of the relief sought vests personal jurisdiction in the court to render a judgment on the merits of the petition.

### C

In light of our conclusion that the trial court had the authority to open the judgment terminating the mother's parental rights, we turn next to the merits of that decision. DCYS maintains that the trial court abused its discretion in opening the judgment because the court made no findings about the mother's inability to present a defense at the time of the original hearing, improperly concluded that she had a meritorious defense, and considered evidence that was legally irrelevant to its conclusions. We disagree.

In its memorandum of decision granting the mother's motion to open, the trial court found specifically that DCYS, through its agent LeMay, had contributed, even if inadvertently, to the mother's delay in coming forward to reclaim her rights to her child. The court noted the importance of a sound decision for the child as well as for the mother. It then concluded that the mother's application for relief, "supported by affidavit and testimony presented at the hearing . . . has shown that genuine issues exist, which, if established after a full hearing on the merits could constitute a meritorious defense to the allegations of the petition to terminate [the] mother's parental rights." The record does not indicate that DCYS asked the court for a further articulation of the basis of its decision.

We do not undertake a plenary review of the merits of a decision of the trial court to grant or to deny a

---

[19] Res judicata would not have barred the filing of a second petition for the termination of parental rights based on a material change of circumstances. *In re Juvenile Appeal (83-DE)*, 190 Conn. 310, 318–20, 460 A.2d 1277 (1983).

motion to open a judgment. The only issue on appeal is whether the trial court has acted unreasonably and in clear abuse of its discretion. *Gillis* v. *Gillis,* 214 Conn. 336, 340–41, 572 A.2d 323 (1990); *Celanese Fiber* v. *Pic Yarns, Inc.,* 184 Conn. 461, 467, 440 A.2d 159 (1981). On the limited record before us, we find no abuse of discretion. With regard to the circumstances surrounding the mother's initial failure to assert a meritorious defense, the trial court was entitled to attach credibility to the psychological and economic circumstances of the mother as they were revealed in the evidence before the court. The trial court was not required to assign any special weight to the interests or expectations of DCYS as statutory parent, or those of the preadoptive parents, whose participation the trial court had appropriately limited, as we have concluded in part II of this opinion.[20] Without a further articulation of its ruling, we have no basis for concluding that the trial court based its decision on any evidence that was legally irrelevant.

We note, furthermore, that the trial court's ruling finds additional support in the cramped circumstances of the original proceedings for the termination of the mother's rights. Notice by publication, although sometimes necessary, is not the preferred method for assuring full participation in so significant an impairment of constitutionally protected parental rights. See *Santosky* v. *Kramer,* supra. The purpose of the notice in this case was to inform the mother of the hearing regarding the termination of her parental rights. Notice is not a mere perfunctory act in order to satisfy the technicalities of a statute, but has, as its basis, constitutional dimensions. "An elementary and fundamental

---

[20] The mother points out that, in opposing the motion to open, DCYS presented no evidence about the expectations of the preadoptive parents except the testimony of LeMay that she had informed the mother of the child's placement with a family who wanted to adopt her.

requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane* v. *Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950).[21]

Furthermore, although the mother, had she appeared, would have been entitled to the assistance of counsel; General Statutes § 45a-716 (b); her interests, in her absence, were entirely unrepresented. The mother's right to counsel in the termination proceeding was duly noted on the summons issued for her appearance at the proceeding, the order for temporary custody, the order of notice of the termination proceeding, and the published notice of the termination proceeding. The mother was unable, however, to exercise her right to counsel without actual knowledge of the proceedings against her. While it may be argued that the mother's concealment of her whereabouts constituted a waiver of her right to counsel, "waiver is

---

[21] Although none of the parties has raised an issue relating to the notice of the original proceedings provided to the mother, we note that DCYS's efforts to locate the mother were minimal. The record indicates that the application for order of notice by publication fails to cite any fact that would indicate that reasonable efforts were made to locate the child's mother or father. Indeed, the petition upon which the trial court acted merely indicates the residence as "unknown." Furthermore, the only evidence that DCYS presented at the hearing for the coterminous petitions in regard to its efforts to locate the mother was described by Polverari as follows: "I made a report to the West Haven Police Department. I gave them the information that was taped on the 911 conversation, there was a gentlemen's name, the man who called, and they swore that they would make contact with him and see if there was any relationship. So, we made every attempt that we would have." Surely, it is implicit in General Statutes § 45a-716, which authorizes service by publication, that DCYS is required to make a reasonable effort to locate the parents of the child and that the record indicate these efforts prior to granting a petition for termination of parental rights. To interpret § 45a-716 to require anything less would jeopardize the constitutionality of the statute.

. . . the intentional relinquishment . . . of a *known* right . . . ." (Emphasis added.) *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938); *State* v. *Barrett,* 205 Conn. 437, 450, 534 A.2d 219 (1987).[22]

Finally, DCYS never notified counsel for the child that the mother had made contact with DCYS. As the statutorily appointed parent for the child endowed with the obligation to promote the child's welfare, DCYS should have notified the child's attorney as soon as it became aware of the whereabouts of the mother. Only upon full disclosure of the relevant information could the child's counsel exercise her duty to represent the child's interests. These procedural aspects of the original hearing furnish additional grounds for sustaining the decision of the trial court to grant the petition to open the judgment terminating the mother's rights.

## D

DCYS maintains finally that, even if the trial court properly opened the initial judgment, it improperly denied the amended petition for termination of parental rights. The trial court ruled that DCYS had not met

---

[22] In future cases, the trial court should seriously consider the appointment of legal counsel to represent an absent parent in proceedings for the termination of parental rights in those cases in which the parent has received only constructive notice of the pendency of the proceedings. As the history of this case indicates, it is sometimes difficult for DCYS, in good faith, to balance its dual missions of responsibility for the well-being of a neglected child and responsibility for the reuniting of a child with his or her natural parents. See General Statutes § 17a-101 (a) (establishing the public policy of this state regarding child welfare). Counsel for an absent parent might, for example, agree to the immediate granting of a neglect petition while asking for a continuance of the termination proceeding in order to pursue an aggressive search to locate the parent and to determine his or her wishes. Early intervention to protect the interests of all interested parties may prevent the later imposition of severe emotional burdens not only on absent birth parents; see also *In the Matter of Robert O.* v. *Russell K.,* 80 N.Y.2d 254, 604 N.E.2d 99, 590 N.Y.S.2d 37 (1992); but also on well intentioned preadoptive parents.

its burden of proving, by clear and convincing evidence, that the mother had abandoned her child; General Statutes § 17a-112 (b) (1); had committed acts of commission or omission regarding the child's welfare; General Statutes § 17a-112 (b) (3); or had failed to establish an ongoing parental relationship with the child. General Statutes § 17a-112 (b) (4). In its appeal, DCYS claims that the evidence that it presented was sufficient to support the petition for termination at least with regard to the grounds of abandonment and the absence of an ongoing parent-child relationship. DCYS further maintains that the trial court was required to waive the statutory requirement, in § 17a-112 (b), that the grounds for termination must have existed for at least one year. We disagree.

A determination by the trial court that statutory criteria for termination of parental rights have not been established is subject to appellate reversal only if the trial court's findings are clearly erroneous in light of the evidence in the whole record. *In re Luis C.,* 210 Conn. 157, 166, 554 A.2d 722 (1989). The relevant record, for this purpose, consists of the entirety of the evidence concerning events until April 14, 1992, the date of the filing of DCYS's amended termination petition.

DCYS argues that the trial court's refusal to grant the petition for termination insofar as it rested on the ground of abandonment was inconsistent with two other findings that abandonment had been established. DCYS reminds us that the trial court found that abandonment had been proved both in its order granting the original coterminous neglect petition and in its original judgment terminating the mother's parental rights.

The trial court's ruling with regard to the neglect petition does not impair the validity of its ruling with regard to the petition for the termination of the

mother's parental rights. A court may grant a neglect petition when its allegations have been proved by a preponderance of the evidence, but it may not grant a termination petition unless it finds, upon clear and convincing evidence, that one of the statutory grounds for termination has been proved. General Statutes § 17a-112 (b). "An adjudication of neglect is not a basis per se for termination of parental rights. . . . While much of the evidence on which a finding of neglect on a neglect petition has been based may also be some evidence concerning the [same ground alleged] in a termination of parental rights petition, the trial court must examine such evidence ab initio and in a new light. . . . [W]hen the court considers termination of parental rights, each element of the statute must be proved by clear and convincing evidence." *In re Juvenile Appeal (84-AB)*, 192 Conn. 254, 266–67, 471 A.2d 1380 (1984).

The trial court's initial judgment finding abandonment by the mother in a hearing in which the mother did not participate, either personally or through appointed counsel, did not require the trial court to find abandonment after the presentation of evidence as to the reason why the mother left the child at the hospital and her subsequent conduct with relation to the child. The statutory test for abandonment is that "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." General Statutes § 17a-112 (b) (1). The record at trial on this issue provided an evidentiary basis for the trial court to find credible the psychological explanation offered for the mother's initially irresponsible conduct in concealing her identity until November 12, 1991. The trial court could also rely on testimony that the mother's conduct after November 12, 1991, demonstrated her eagerness to reestablish contact with the child by her pursuit of appropriate

legal remedies and by her personal appearance at all scheduled hearings. The mother also initiated efforts to visit with her child and to take on the limited parental role available to her while DCYS remained the child's statutory parent. The trial court was entitled to find that this evidence, in its totality, did not show a lack of maternal "interest, concern or responsibility as to the welfare of the child."

DCYS contends, in the alternative, that the trial court was required to find that DCYS had presented sufficient evidence to prove another ground for termination of the mother's parental rights; namely, the absence of an ongoing parent-child relationship between the mother and the child as of April 14, 1992, the date of the amended termination petition. DCYS points to the undisputed facts of the mother's failure to acknowledge the child for four and one-half months and the absence of any contact between the mother and the child, while DCYS was the child's statutory parent, except for four visits during March and April of 1992.

To sustain the termination petition on this ground, the trial court would have had to find "there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes § 17a-112 (b) (4). In support of the trial court's ruling to the contrary, the mother notes that the trial court found that the visitations between the mother and the child, although few in number, had been successful, both for the child and for the mother. In particular, the evidence indicated that the mother had

conducted herself in an appropriately maternal manner throughout each visitation. When the issue is the relationship of a parent with a very young child, we have held that "the inquiry must focus, not on the feelings of the infant, but on the positive feelings of the natural parent." *In re Valerie D.*, supra, 532. Furthermore, the evidence regarding the quality of the mother's relationship with her child must be reviewed in the light of the mother's limited access to visitation at the time of the petition. See *In re Jessica M.*, supra, 472–73. Looking to the future, as the statute contemplates, the court was entitled to rely on the favorable prognosis for the development of a sound parent-child relationship envisaged by the clinical psychologist who interviewed the mother on her own behalf, rather than on the pessimistic prognosis presented by the clinical psychologist who testified for DCYS. The trial court's finding was not clearly erroneous.

Even if we were to disagree with the trial court's rulings on the specific grounds alleged in the DCYS petition, DCYS's appeal would still fail because the underlying events all occurred during the first year of the child's life. Although § 17a-112 (c) permits a trial court to "waive the requirement that one year expire prior to the termination of parental rights if it finds from the totality of the circumstances surrounding the child that such waiver is necessary to promote the best interest of the child," the trial court made no such determination in this case. It is implicit in the rulings that the trial court actually made that it would not have found a waiver to be appropriate. Because the statute entrusts the decision concerning waiver to the discretion of the trial court, the only issue on appeal is whether the trial court abused its discretion. There is no basis for a conclusion of abuse of discretion on the record in this case.

## IV

Our searching review of the record, the opinions of the trial court, the oral arguments and the briefs presented by the parties and by the amici curiae leads us to affirm the judgment of the trial court both in the appeal of the preadoptive parents and in the appeal of DCYS. In light of the number of issues that we have been called upon to resolve and the widespread empathy for and concern about the rights of birth parents and of preadoptive parents that this case has understandably engendered, we summarize the conclusions that underlie our decision.

In the appeal of the preadoptive parents, we conclude that they have no right to intervene in any litigation in which the issue is the validity of the termination of parental rights. The legislature has established a bright line between termination proceedings and adoption proceedings to which our procedural rules must conform.

In the appeal of DCYS, the central issue is the extent of the trial court's authority to open a judgment terminating parental rights. We conclude that the legislature has struck a balance between a strong policy interest in finality of judgments terminating parental rights and an equally strong policy interest in doing justice in the individual case. We conclude, therefore, that the legislature intended the operative provisions of §§ 52-212a and 17a-112 to coexist so that the Superior Court has limited jurisdiction to open a judgment for termination of parental rights, for a period of four months after its rendering, but not thereafter in the absence of waiver or consent to the court's continuing jurisdiction over the parties.

In the particular circumstances of this case, we conclude that DCYS waived its objection to the trial court's exercise of jurisdiction by filing an amended petition

seeking a termination of parental rights on additional statutory grounds that had no evidentiary foundation in its original petition for termination. We also conclude that the trial court did not abuse its discretion in granting the mother's motion to open the judgment, and that the trial court could reasonably have concluded that DCYS had failed to establish any ground for termination of the mother's parental rights.

The judgment is affirmed.

In this opinion CALLAHAN and BERDON, Js., concurred.

BORDEN, J., with whom NORCOTT, J., joins, concurring and dissenting. I agree with the majority opinion that the trial court had the authority to open its judgment of termination of parental rights beyond the twenty day appeal period. I also agree with the majority opinion that: (1) General Statutes § 52-212a applies to a termination judgment; (2) General Statutes § 17a-112 (i) does not confer continuing jurisdiction on the Superior Court to open a judgment of termination beyond the four month period; and (3) the trial court, therefore, was incorrect in opening the judgment beyond the four month period over the objection of DCYS.[1]

I disagree, however, that DCYS waived its objection to the court's assertion of personal jurisdiction over it after the four month period had elapsed. I therefore dissent from the ultimate disposition of this case.

[1] Although under my analysis it would not be necessary to reach the issue, I also agree with the majority regarding the disposition of the preadoptive parents' motion to intervene in the proceedings on the mother's motion to open the judgment. Because under my analysis, however, DCYS did not waive its objection to the untimely opening of the judgment, I would not reach and I express no opinion on the issues decided by the trial court subsequent to opening the judgment as discussed in the majority opinion.

Before discussing the majority's waiver analysis, I note that I decline to join one statement of dictum in the majority opinion. In part III A 1, the majority implies that a construction of General Statutes § 52-212a excluding its applicability to a judgment of termination of parental rights would be "constitutionally precarious." To the extent that this may imply, further, that the legislature could not constitutionally exclude such judgments from the ambit of that statute, I decline to join that implication because I see no need to expound, even by implication, on such a thorny issue until and unless we are required to do so by virtue of such legislation as applied to the particular facts of a case. It is quite sufficient to note, as the majority does, that our construction of § 52-212a in this case furthers fundamental constitutional rights by affording "a fair opportunity to present a meritorious defense, or otherwise to permit an appropriate exercise of judicial discretion, with regard to a judgment terminating parental rights." It is unnecessary to imply anything further. I turn, therefore, to my disagreement with the majority's waiver analysis.

I agree with the premise of the majority opinion, namely, that whether the trial court improperly opened the judgment of termination after the four month period provided in § 52-212a is a question of whether, after that time period had elapsed, the court nonetheless had personal jurisdiction over DCYS. I disagree, however, with the conclusion of the majority that, although the trial court had lost personal jurisdiction over DCYS by the passage of the four month period, DCYS, after objecting to the untimely opening of the judgment,[2] waived its earlier objection by subsequently

---

[2] The majority recognizes that DCYS did not waive its claim of lack of jurisdiction, nor did DCYS submit to the court's jurisdiction, at the time it objected to the biological mother's motion to open: "As of that time, DCYS had not waived the four month limitation provision of § 52-212a."

amending its petition without simultaneously and expressly reasserting its earlier properly preserved objection.

The majority argues that DCYS submitted to the jurisdiction of the court and thereby waived its right to object on appeal to the opening of the judgment because DCYS had filed an amended petition for the termination of the biological mother's parental rights without also filing an express reservation of its right to challenge later the trial court's untimely opening of the judgment. The majority's legal analysis is flawed and runs counter both to decisions of this court and to the provisions of the Practice Book regarding challenges to improper assertions of jurisdiction.

Historically, a party submitted to the jurisdiction of the court and waived any right to claim that the court lacked jurisdiction over it by merely entering a general appearance and proceeding to contest the case on its merits. See, e.g., *Brown* v. *Allen,* 166 Conn. 174, 176–77, 348 A.2d 666 (1974); *Beardsley* v. *Beardsley,* 144 Conn. 725, 728–29, 137 A.2d 752 (1957). In order to avoid submitting to the court's jurisdiction, a party must have appeared specially for the sole purpose of challenging the court's jurisdiction. See, e.g., *Johnson* v. *Zoning Board of Appeals,* 166 Conn. 102, 107, 347 A.2d 53 (1974); *Foley* v. *Douglas & Bros., Inc.,* 121 Conn. 377, 381, 185 A. 70 (1936); 1 Restatement (Second), Conflict of Laws § 81 ("[a] state will not exercise jurisdiction over an individual who appears in the action for the sole purpose of objecting that there is no jurisdiction over him").

An overwhelming majority of courts, including Connecticut, held, however, that one who appeared in an action solely for the purpose of objecting to the court's jurisdiction did not waive this objection by answering over or otherwise defending the case on its merits, after

that objection had been overruled. *Coyne* v. *Plume,* 90 Conn. 293, 297, 97 A. 337 (1916); see also annot., 62 A.L.R.2d 937, Objection to Jurisdiction—Waiver, and cases cited therein. The rule was that after the party had challenged the court's jurisdiction, it could make its case on the merits without waiver of the jurisdictional objection and could obtain appellate review of the jurisdictional issue in an appeal from the judgment ultimately rendered. *Coyne* v. *Plume,* supra; annot., 62 A.L.R.2d 937, supra. If in such an appeal an appellate court concluded that the jurisdictional ruling had been wrong, then the judgment would be reversed and the action dismissed. *Coyne* v. *Plume,* supra, 302.

The Practice Book was amended in 1978 to eliminate the artificial distinction between general and special appearances. Practice Book § 142[3] provides that a defendant may contest personal jurisdiction by filing a timely motion to dismiss; see Practice Book § 144;[4] even after having filed a general appearance.[5] Most significantly, moreover, Practice Book § 146 provides: "If any motion to dismiss is denied with respect to any jurisdictional issue, the defendant may plead further without waiving his right to contest jurisdiction further."

[3] Practice Book § 142 provides: "Any defendant, wishing to contest the court's jurisdiction, may do so even after having entered a general appearance, but must do so by filing a motion to dismiss within thirty days of the filing of an appearance. Except in summary process matters, the motion shall be placed on the short calendar to be held not less than fifteen days following the filing of the motion, unless the court otherwise directs."

[4] Practice Book § 144 provides: "Any claim of lack of jurisdiction over the person or improper venue or insufficiency of process or insufficiency of service of process is waived if not raised by a motion to dismiss filed in the sequence provided in Secs. 112 and 113 and within the time provided by Sec. 142."

[5] Consequently, the majority's statement that "[o]ur cases have recognized that a party may waive its objection to a trial court's erroneous exercise of personal jurisdiction if that party 'generally appears in the case and actively prosecutes the action or contests the issues.' *Foley* v. *Douglas & Bros., Inc.,* [121 Conn. 377, 380, 185 A. 70 (1936)] . . ." ignores this fundamental change in the law.

Although DCYS's objection to the motion to open was not explicitly labeled a motion to dismiss, DCYS obviously was attempting to defeat the opening by claiming that the court did not have jurisdiction beyond the four month period. How this can be viewed as anything but the practical equivalent of a motion to dismiss I do not know. I do not understand why this sensible rule—permitting a party both to challenge jurisdiction and to litigate the claim on its merits after having its challenge rejected without waiving its earlier objection—applies at the beginning of a civil action but, as the majority concludes, should not apply more than four months after the end of the case in which the party contesting jurisdiction has already prevailed. Indeed, the important principle of finality of judgments, upon which the four month period of § 52-212a rests, counsels that we should be more reluctant to infer a waiver of personal jurisdiction by a party's conduct occurring after the court has improperly opened a judgment more than four months after its rendition than we are to infer a waiver by answering a complaint after the court has improperly overruled a motion to dismiss at the beginning of the case.

In this case, after the four month period had elapsed, DCYS vigorously contested the authority of the court to exercise its personal jurisdiction. Thus, even under the old approach, such a waiver would not have obtained. Under that approach, if a party's objection to the court's jurisdiction was overruled, the party was free to contest the action on its merits without waiving its earlier objection. *Coyne* v. *Plume,* supra. That principle is now explicitly articulated by Practice Book § 146.

Nowhere in our Practice Book or case law, however, is there any requirement that a party who specifically challenges jurisdiction waives that challenge by thereafter litigating the case on its merits *or* that, in order to preserve its earlier challenge, the party must first

file an express reservation of the challenge. Such a requirement flies in the face of Practice Book § 146 and of the case law that preceded it. The sole issue in a proper waiver inquiry, under both the old rules and our current Practice Book rules, is whether the party failed to object to the court's jurisdiction in a timely fashion and instead contested the case on its merits.

As a matter of policy, the majority's waiver analysis is particularly inapt in a termination of parental rights proceeding because it places DCYS in an untenable position. The majority assumes that DCYS had a statutory obligation to assert the additional grounds that it, in good faith, believed required a termination of the biological mother's parental rights. I agree with that assumption. Indeed, it seems to me that DCYS, having been unsuccessful (yet, on the law, having been correct) in its objection to the opening of the judgment, acted responsibly and in the best interest of all the parties by promptly bringing forward all the evidence and legal theories for termination that it, in good faith, believed the case warranted. The majority's response to this argument is that DCYS's "duties as statutory parent do not enable it to proceed as a petitioner in our courts without conferring personal jurisdiction on the court to assess the merits of its claims."[6]

The result of such a rule, however, is that, in order for DCYS to maintain its earlier *correct* objection to the court's assertion of jurisdiction, DCYS was required to rest solely on its earlier grounds for termination, after those very grounds had been vacated by the court's improper exercise of its jurisdiction, and to abstain from fulfilling its statutory obligation to assert additional and what it regarded as valid grounds for

---

[6] Indeed, in this part of the opinion, the majority abandons its earlier suggestion that DCYS could have nonetheless preserved its jurisdictional challenge by filing an express reservation.

termination. That does not strike me as sound policy, either from the viewpoint of the statutory scheme for termination of parental rights, or from the viewpoint of the policies of fairness and finality inherent in § 52-212a. Furthermore, it is incongruous to argue, as the majority opinion does, that a termination proceeding is an ordinary civil action subject to the four month period and yet, at the same time, imply in its waiver argument that the ordinary rules regarding challenges to jurisdiction do not apply.

None of the cases cited in the majority opinion supports its conclusion that amending the petition constituted a waiver of DCYS's objection to the court's jurisdiction. Indeed, I have found no case under § 52-212a in which a party *who objected to the untimely opening of a judgment* was held to have waived that objection by subsequently litigating the case on its merits.

In *Cichy* v. *Kostyk,* 143 Conn. 688, 125 A.2d 483 (1956), for example, the defendant never challenged the untimely opening of the judgment on jurisdictional grounds, but merely claimed that the trial court had abused its discretion in doing so. The opinion, therefore, does not support the principle that, having challenged the jurisdiction of the court, a party waives its objection by further litigating the action on its merits. Similarly, in *Ferguson* v. *Sabo,* 115 Conn. 619, 624, 162 A. 844 (1932), the party never challenged the court's untimely assertion of jurisdiction: "As far as the record discloses, when they were cited in they made no objection to the right of the court to litigate the issues raised by the counterclaim, filed their answer to it, and proceeded with the trial of the case. Having thus submitted the disposition of the case to the court *without objection*, they cannot . . . be heard to say that the court had no power to deal with the controversy as it affected them." (Emphasis added.)

In *Foley* v. *Douglas & Bros., Inc.*, supra, 381, we refused to restore a case to the docket because the defendant had filed a motion to erase the case from the docket, "thus making what was in effect a special appearance to prosecute that motion, with its attack upon the jurisdiction of the court. This was not such an appearance as would waive lack of jurisdiction of the court over its person . . . ." Nowhere in our decision did we discuss the effect of any subsequent action by the defendant had he lost the jurisdictional challenge.

In *Lake Garda Co.* v. *Lake Garda Improvement Assn.*, 156 Conn. 61, 238 A.2d 393 (1968), we recognized that if a party contests the jurisdiction of the court upon a motion to open the judgment, the party challenging that opening does not submit to the court's jurisdiction. In that case, the plaintiff who had opposed the opening refused to participate any further in the case. I do not read *Lake Garda Co.*, however, as the majority opinion apparently does, as requiring the objecting party to keep repeating its objection in order to maintain its earlier correct challenge.

The majority opinion in the present case ignores the procedural posture of *Lake Garda Co.* by implying that the plaintiff did not waive its jurisdictional objection only because "the plaintiff advanced strenuous opposition to [the opening] *and* steadfastly maintained that position thereafter." (Emphasis added.) Id., 65. From this statement, the majority opinion appears to infer that the plaintiff in *Lake Garda Co.* preserved its jurisdictional claim only by thereafter continuing to object expressly to the court's authority to reopen the judgment—an objection that it had already clearly made when the court opened the judgment. That reading is not supported by the facts of the case. Thus, the majority opinion reads the quotation above as having set forth some kind of all encompassing standard that

a party must meet in order to preserve its objection. Such a reading does violence to our opinion in *Lake Garda Co.* The court in that case merely used the plaintiff's steadfastness as factual support for the legal conclusion that the plaintiff had appeared originally to contest the jurisdiction and did not appear generally without making the requisite objection.

Finally, in *Receivers Middlesex Banking Co.* v. *Realty Investment Co.,* 104 Conn. 206, 214, 132 A. 390 (1926), upon which the majority also relies, we held that if a defendant, after unsuccessfully challenging personal jurisdiction, goes beyond answering the complaint and "seeks affirmative and distinctive relief beyond the scope of the issues presented upon the complaint, he must be held to have subjected himself voluntarily to the court's jurisdiction." This case neither supports the majority's opinion nor undermines my conclusion in dissent.

First, its principle may well have been overruled by Practice Book § 146, which provides, as noted above, that after a motion to dismiss is denied, "the defendant may plead further without waiving his right to contest jurisdiction further." Indeed, such a reading of Practice Book § 146 would be consistent with the prevailing view under the Federal Rules of Civil Procedure that even the filing of a counterclaim or cross-claim does not waive the original jurisdictional challenge. See, e.g., *Bayou Steel Corporation* v. *M/V Amstelvoorn,* 809 F.2d 1147, 1148–49 (5th Cir. 1987); *Chase* v. *Pan-Pacific Broadcasting, Inc.,* 750 F.2d 131, 133–34 (D.C. Cir. 1984); *Gates Learjet Corporation* v. *Jensen,* 743 F.2d 1325, 1330 n.1 (9th Cir. 1984), cert. denied, 471 U.S. 1066, 105 S. Ct. 2143, 85 L. Ed. 2d 500 (1985) (filing of permissive counterclaim did not constitute waiver of jurisdictional challenge); *Neifeld* v. *Steinberg,* 438 F.2d 423, 426–431 (3d Cir. 1971).

Second, in this case DCYS did not, by amending its petition seek "distinctive relief beyond the scope of" the original petition. *Receivers Middlesex Banking Co.* v. *Realty Investment Co.,* supra, 214. The relief DCYS sought—termination of the biological mother's parental rights—remained the same. It merely added additional legal and factual bases for that same relief. This is not comparable to a counterclaim or crossclaim. Finally, even if we were to regard the rule in *Receivers Middlesex Banking Co.* as having survived Practice Book § 146, it should not be applied to a termination case such as this because to do so would, as a matter of public policy, undermine the statutory obligation of DCYS to bring promptly to the court's attention all of the legal grounds for termination that it believes the available evidence warrants.

In light of this analysis, I believe that the majority opinion creates new procedural and jurisdictional rules that have no support in our law. The majority ignores the current and historical procedural methods by which a party can fairly and equitably challenge the court's exercise of jurisdiction over it and, if unsuccessful, nonetheless preserve its right to litigate the suit on its merits, without losing an appellate opportunity to correct the error of the trial court in rejecting the jurisdictional challenge.

I recognize that this is an emotionally difficult case that, as the majority recognizes, brings into tension the statutory policies of finality of termination of parental rights and of opening judgments in the interests of justice. It is clear to me that the legislature has accommodated that tension by enacting § 52-212a, which cuts off the court's jurisdiction over the parties after four months, unless there is a waiver. The majority's reliance on this waiver argument, however, as the sole predicate for the trial court's jurisdiction, gives credence to the saw that "hard cases make bad

law." Or perhaps more appropriate in this case is a twist on that saying: "Hard cases often ignore good law." I would therefore reverse the judgment of the trial court and remand the case with direction to reinstate the original judgment.