[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The Commissioner of the Department of Children and Families (DCF) has filed petitions to terminate the parental rights of Patricia D. and Stanley D., parents of the children Stanley and Brandon. The case was tried to the court over the course of three days. At the conclusion of the trial, the court, ruling from the bench, terminated the parental rights of the father and reserved decision on the case against the mother. The court now grants the petition as to the respondent mother[1]
and terminates her parental rights.
The respondent was born on September 5, 1958, in Hartford, Connecticut. Much of the information about her early childhood is based on her self-reporting. The respondent, however, is not an accurate historian.
The respondent quit high school six months before graduation. She later attended classes at a community college to obtain a Graduate Equivalency Degree. According to the respondent, she was engaged to be married in 1981 when she was raped by another man. As a result of the rape she became pregnant and her fianc´ committed suicide. On October 19, 1981, a child, Crystal, was born. Thereafter, during the 1980s the respondent claims to have been raped by two other men at gunpoint.
DCF became involved with the respondent on October 18, 1995, when the Winsted Police Department reported to DCF that the respondent had struck and injured Crystal. On October 25, 1995, the respondent voluntarily placed Crystal in the care of DOF.
Crystal informed DCF that the respondent exhibited bizarre behaviors, such as forcing her to brush her teeth with bleach, waking her up in the middle of the night to clean the house, and giving her excessive doses of medication. Crystal also reported that her mother forced her to steal and to stay up all night doing home assembly work. She also claimed that the respondent had hit her with high heels and coat hangers, tore off her shirt, screamed, swore, failed to pay bills resulting in utilities being shut off, and had left her alone in the house without food for as long as CT Page 1867 two days. Crystal alleged that the respondent had endangered her by permitting one of the respondent's boyfriends to drive her while he was intoxicated. Crystal also reported that the respondent had used cocaine and marijuana in her presence.
On April 19, 1996, Dr. D.A. Begelman, Ph.D., in a letter to the respondent's public defender, opined that "certain features of the patient's case may indicate the presence of a severe psychiatric disorder." He also stated "there are several symptomatic patterns in her behavior which border on the bizarre, or psychotic dimension of psychiatric functioning." Begelman diagnosed the respondent, with Bipolar Disorder and Antisocial Personality Disorder. According to Begelman, family members had reported that the respondent threatened to kill Crystal and other family members with a gun and then shoot herself. The respondent tried to minimize this incident, but Begelman did not credit her explanation. Family members also indicated to Begelman that Crystal lived in fear because of respondent's bizarre behaviors. Begelman found the family members to be reliable informants who supplied accounts of the recent past which were entirely consistent.
On August 7, 1996, the respondent participated in a psychiatric evaluation performed by Dr. Walter A. Borden, M.D. According to Borden, the respondent "is a seriously mentally disturbed person." His diagnosis included "findings of depression, a mixed personality disorder with hysterical and obsessive/compulsive features, and what appears to be a chronic post-traumatic stress disorder." Borden also observed that the respondent had become excessively attached to Crystal. The attachment took on unrealistic proportions, resulting in an extreme need to control her daughter to the point that she acted inappropriately with her. The respondent, however, had virtually no insight into the inordinate need she had for her daughter.
Based on respondent's inability to parent Crystal, Crystal was committed to the care and custody of DCF on February 28, 1997. She remained in DCF's care until her eighteenth birthday in 1999.
In late 1996, the respondent met Stanley D. upon his release from a rehabilitation program at Berkshire Woods. The respondent became pregnant by him soon after they met, although the respondent had told him that she could not become pregnant. Their relationship eventually became plagued by domestic violence.
The child, Stanley, was born to the couple on September 26, 1997. Thereafter, the respondent was often moody, highly volatile and required a great deal of sleep. She left much of the baby's care to the father. CT Page 1868
At the time of Stanley's birth, the respondent was still visiting with Crystal, who was in foster care. The respondent and the father were living together, although the respondent denied this to DCF. The respondent was uncooperative with DCF. She failed to consistently keep her appointments with treatment providers and failed to regularly visit Crystal or to be present for home visits.
In January of 1998, the respondent found that she was pregnant again. She stated to a DCF social worker during a home visit that she was considering an abortion. She continued the pregnancy however and did not seek prenatal care until the twenty-third week of her pregnancy.
On May 29, 1998, the respondent informed Crystal that she had broken her water. Crystal observed blood on the respondent's clothing. Despite these obvious signs of premature labor, the respondent did not seek medical attention until June 2, 1998. On June 3, 1998, the respondent gave birth prematurely to an infant son, Brandon, at only twenty-five weeks of gestation. Brandon weighed 1 pound, 15.5 ounces at birth and was cared for by the Neonatal Intensive Care Service at the University of Connecticut Health Center/John Dempsey Hospital.
When the respondent did present herself to a hospital she left Stanley alone and uncared for. As a result, on June 5, 1998, DCF invoked a ninety-six-hour hold on Stanley and filed a motion for temporary custody alleging that Stanley and Brandon were uncared for. Moreover, the respondent's statements to DCF, to the nursing staff and others surrounding the events leading to the birth of Brandon were inconsistent and evidenced mental illness.
While the respondent was still in the hospital, DCF inspected the respondent's apartment. The cat litter box was found to be overflowing with cat feces. Litter and feces were on the floor. The baby's crib was filled with blankets and toys, the carpet was rotted, there was sawdust shavings on the floor and clothing was stuffed and overflowing in boxes on the floor. In the living room there was a soiled twin mattress with numerous toys on it. The baby's bath seat was in the bathtub, which was filled with grayish brown, dirty water. Few clothes could be found for Stanley and the baby bottle nipples were corroded with old, dry milk that had turned orange in color.
Notwithstanding these circumstances, the order of temporary custody was vacated by agreement on June 10, 1998, because the respondent was out of the hospital and available to resume caring for Stanley. Brandon was expected to be hospitalized for several months. The respondent was given interim specific steps to follow until the disposition of the case. CT Page 1869
During this period, the respondent did not comply with the specific steps. She visited infrequently with Brandon. When she did visit, she had to be supervised because she did not exhibit appropriate care of the infant. In addition, the respondent was not participating in parent training necessary for her to care for Brandon's special needs once he was released from the hospital.
Brandon was diagnosed with lung disease. He was discharged from the hospital and prescribed Ventolin, a respiratory medication, and diuretics. Brandon also had a history of poor feeding and had a milk allergy. After his discharge, the hospital recommended that he take safflower oil for added calories and also take the vitamins, Reglan and Zantac. It was critical that his case be followed by a pediatric pulmonary physician, a gastroenterologist and that he be weaned off the diuretics.
Brandon also had Stage II ROP, a retinal condition caused by his prematurity. This condition required proper treatment to prevent blindness.
The respondent completed a University of Connecticut training program to enable her to care for Brandon's special needs. On September 25, 1998, Brandon was returned to the respondent's custody. On October 16, 1998, the court adjudicated the children uncared for and ordered protective supervision for six months.
Once Brandon was returned to the respondent, the family had the benefit of Birth-to-Three early intervention services[2] and a visiting nurse. The respondent was required to master a regimen of care, feeding and medications for Brandon. This she did, performing well until November 1998. At that time, Brandon was thriving and the respondent was properly administering his medications. She also was interacting and bonding normally with both her sons.
Once these services were removed, however, the respondent failed to properly care for Brandon. She and the father resumed abusing substances and renewed their domestic violence to such an extent that it directly threatened the welfare of the children. The respondent's behavior once again became aberrant and she was verbally abusive to both Stanley and Brandon. The respondent was heard to refer to Brandon as "f_____ bastard."
On December 8, 1998, DCF filed a motion of contempt against the respondent based on her failure to comply with the court expectations ordered on October 16, 1998. By mid-December 1998, DCF became aware that the respondent also had not been taking Brandon to the pediatric medical CT Page 1870 appointments that were vital to his health.
On December 16, 1998, the respondent was found in contempt by the court, Swienton, J. The court ordered the respondent to seek a restraining order against the father by December 17, 1998, prohibiting his having any contact with the children.
On December 17, 1998, DCF invoked a ninety-six-hour hold on behalf of Stanley and Brandon and filed a motion to open and modify the disposition of protective custody. Since that time, both children have continuously been in foster care.
On December 18, 1998, a judge of the Superior Court granted DCF's petition for an order of temporary custody and issued the respondent new specific steps. On December 22, 1998, the order of temporary custody was sustained by the court. On December 23, 1998, the court modified the disposition as to Brandon from protective supervision to a commitment. On February 16, 1999, the court similarly modified the disposition as to Stanley to a commitment to DCF.
Subsequent to December 1998, the respondent and the father ended their relationship.
The respondent has participated and completed counseling, including anger management, at the Charlotte Hungerford Hospital, domestic violence counseling at the Susan B. Anthony Project, a course in child development at the Naugatuck Valley Community College, and parenting classes at the McCall Foundation and at Brooker Memorial, Inc.
Since December 1998, the respondent has been afforded supervised visitation with Brandon and Stanley, which she has consistently attended. Initially, the DCF social workers who supervised the visits provided the respondent with feedback and guidance during or after visits and intervened when the children's needs were not met during visits. Eventually the social workers lessened their direct involvement in the visits in order to assess respondent's progress and ability to implement what she had learned. The results of this ongoing assessment revealed that the respondent was unable to maintain appropriate parenting without direct supervision.
On March 3, 1999, the respondent began parenting therapy at Thomaston Counseling Associates, LLC (Thomaston). Her goals were to: (1) become less intrusive with the children; (2) supervise them to ensure their safety, as well as setting and enforcing appropriate limits; (3) be available to the children for guidance and nurturance when they needed it; (4) using her visits to meet the children's needs, rather than her CT Page 1871 own needs; (5) be less dominating with Stanley and more engaged and nurturing with Brandon; (6) be more proactive in her parenting and anticipate behavioral problems before they got out of control; (7) read the children's cues; (8) avoid overstimulating the children; (9) be more credible with service providers by being truthful, consistent in attendance and punctual; (10) receive and utilize feedback in a positive manner.
After seventy visits, Thomaston concluded that the respondent "has made progress in being less intrusive with Stanley, and being more aware of safety issues. She has not made adequate progress in forging a stronger bond with Brandon, accurately reading cues, setting limits, providing appropriate nurturance and guidance to the boys, or implementing therapist feedback. Many of the examples illustrating these deficits occurred during our final weeks of meeting. This indicates that, over all, outcomes for this course of therapy were poor."
Since their initial placement, Brandon and Stanley have resided in three "medically fragile" foster homes. Although at the time of the filing of the petition Stanley was designated medically fragile by his pediatrician, he had made significant progress. He has received speech and occupational therapy. He continues to lag in his fine motor skills and is also receiving special education. Stanley has developed a close bond with his foster parents and no longer engages in tantrums as readily as he did when he was younger.
Like his brother, Brandon has had speech and language delays and is closely bonded to his foster parents. Notwithstanding the serious conditions from which he suffered due to his premature birth, his medical conditions have resolved to the extent that he no longer requires medication. Although he continues to be diagnosed as a failure to thrive, he is nearly developmentally on target.
On February 20, 2001, DCF filed petitions to terminate the respondent's parental rights.[3] The case was tried to the court on December 17, 18 and 19, 2001.
Additional facts will be supplied as needed.
"The termination of parental rights is defined as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his [or her] parent . . . [and as such, it] is a most serious and sensitive judicial action." (Internal quotation marks omitted.) In re Jonathan M., 255 Conn. 208,231, 764 A.2d 739 (2001). "When petitioning to terminate parental rights without consent, [DCF] must allege and prove by clear and convincing CT Page 1872 evidence, one or more of the specific grounds set forth in General Statutes § [17a-112 (j)]. . . . The same evidence certainly can establish more than one ground for termination." (Citations omitted; internal quotation marks omitted.) In re Kezia M., 33 Conn. App. 12, 16,632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993).
"In accordance with § 17a-112, [a] hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the . . . court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the . . . court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the . . . court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) In re Daniel C., 63 Conn. App. 339,348, 776 A.2d 487 (2001).
"In the adjudicatory phase, the judicial authority is limited to events preceding the filing of the petition or the latest amendment." Practice Book § 33-3(a). However, "[i]n the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether thedegree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis in original.) In re Latifa K., 67 Conn. App. 742, 748-49, ___ A.2d ___ (2002). That is, "the court can rely on factors occurring after the date of the filing of the petition to terminate parental rights when considering if additional time would promote rehabilitation." In re AmberB., 56 Conn. App. 776, 785, 746 A.2d 222 (2000).
 I
"As part of the adjudication process, § [17a-112 (f)] requires that the court find by clear and convincing evidence that the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts. . . ." (Internal quotation marks omitted.) In reTabitha T., 51 Conn. App. 595, 599, 722 A.2d 1232 (1999).
The following services were offered to the mother: by DCF, case management services, transportation, visitation, treatment plans, administrative case reviews, regional resource group consultation, funding for services; by Northwest Center for Family Service Mental Health, a parent aide; by the McCall Foundation, parenting classes, substance abuse evaluation, urine screens and anger management; by the CT Page 1873 Susan B. Anthony project, domestic violence counseling; by the Department of Social Services, AFDC, medical insurance, casework services and SSI benefits; by Brooker Memorial, Inc., therapeutic play groups; by Thomaston Counseling Center, extensive individual counseling and "hands on" parenting instruction; by Birth to Three Services, consultations with mother concerning special care of her children; Charlotte Hungerford Hospital, psychiatric evaluation, individual counseling, DBT skills group and women's group.
The respondent argues that DCF did not approve of Thomaston's recommendation of reunification and she insinuates that DCF met with Thomaston's people in December 1999 in a sinister effort to undermine reunification. The court disagrees. DCF and Thomaston had different perceptions of the respondent's progress due to the different formats they provided the respondent to exhibit her parenting ability. It would have subverted the rehabilitation process if DCF had not shared its observations with a key service provider such as Thomaston. DCF's commitment to reunification is evidenced by its allowing the respondent's counseling at Thomaston to continue nearly another year, until Thomaston concluded that the respondent was not making sufficient progress and that the prognosis for further improvement was poor.
Nor does the court agree with the respondent's argument, made in summation, that she was "lulled" into a false sense of progress until the time afforded her to rehabilitate had expired. Although the respondent may well have been confident about reunification with her sons by December 1999, there is no evidence that she was not advised throughout the year 2000 that she was not making sufficient progress. While the respondent testified briefly as to her involvement in parenting and child development classes in 2001, she did not testify that she was at any time lulled into a false sense of accomplishment.
The seventy sessions that the respondent had at Thomaston were an unusually large number of sessions and reflects DCF's patient commitment over a protracted period of time to reunifying the respondent with Stanley and Brandon. By clear and convincing evidence, the court finds that DCF used reasonable efforts to reunify the respondent and her sons.
 II
DCF seeks to terminate the respondent's parental rights based on two adjudicatory grounds: (1) that since the commitment of the children to DCF, the respondent "has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child[ren], such parent could assume a responsible position in the life of the child[ren]," and (2) CT Page 1874 that there is no ongoing parent-child relationship between the respondent and her sons.
 A.
Failure of a parent to achieve sufficient personal rehabilitation is one of seven statutory grounds on which a court may terminate parental rights pursuant to § 17a-112. General Statutes § 17a-112 (j)(3)(B). "That ground exists when a parent of a child whom the court has found to be neglected fails to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of that child." In re Sheila J., 62 Conn. App. 470, 479-80,771 A.2d 244 (2001).
The following additional facts are necessary to the disposition of this issue. Thomaston, where the respondent received individual counseling and parenting instruction, early on noted that the respondent appeared cooperative and "receptive to acquiring parenting skills" and was "gaining confidence and skill" in her parenting and counseling sessions. By the respondent's twenty-first session, her counselor at Thomaston wrote to DCF that the respondent's parenting abilities had improved remarkably and that Stanley and Brandon were bonding well with her.[4]
When the respondent had completed thirty-four sessions, Thomaston recommended "immediate reunification with intensive family preservation services to support the success of the family."
However, during the respondent's supervised visitations at DCF, which unlike those at Thomaston were not therapeutic, DCF saw no such progress. Therefore, after receipt of Thomaston's recommendation, DCF social worker, Joanne Prindle, met with Thomaston therapist Catherine Fiorello in December 1999 to discuss their disparate observations. At the meeting, Prindle shared with Fiorello information and documents reflecting the history of the respondent's parenting and psychological problems.
After the meeting, DCF sent Thomaston a psychological evaluation of the respondent and other background information. With the benefit of this data and after observing the respondent further, Thomaston changed its recommendation. As Peggy Sudol of Thomaston testified, the respondent, though able to recite the reasons why her children were committed to DCF, did not truly understand those reasons nor had she gained insight into her problems. When the respondent no longer was provided with encouragement and direction from her therapist, she was unable to follow through on much of what she had been taught. According to Sudol, the CT Page 1875 respondent's perception did not match reality.
Fiorello, the Thomaston therapist who provided the respondent with intensive parenting therapy for more than twenty months, echoed these concerns. As Fiorello testified, by the summer of 2000 it was apparent that the respondent was not making further progress toward the identified goals. In Fiorello's opinion, the respondent was unable to parent the children on her own, without direct supervision.
By the time the respondent had completed seventy sessions at Thomaston, she had made good progress in being less intrusive in Stanley's play and in demonstrating an awareness of safety issues. However, she continued to markedly favor Stanley over Brandon and repeatedly drew conclusions from the children's conduct or statements that were "based not on reality but on a projection of her own frustration toward others." (Exhibit 5)
Examples, while seemingly trivial, illustrate this problem. On the afternoon of November 20, 2000, the respondent brought a turkey dinner to a parenting session not knowing whether the children had already eaten. When Brandon refused to eat, the respondent was indignant and shouted at Brandon, "You're very stubborn. Do you want to go in the corner." When the respondent was asked if there could be an innocent reason why Brandon did not want to eat she insisted, "No. It's because he's stubborn." On another occasion, Stanley stated that his foster brother had "beat" him. The context of the statement was that the foster brother had defeated him in a game. The respondent, however, insisted that the foster brother had "beaten him up" and resolved to report the foster parents to DCF. She was unable to be dissuaded from this interpretation.
The respondent also failed to set limits for her children. For example, if she told them to do or not do something and they protested, she would readily relent. She also had difficulty training and teaching the children during visits. She demonstrated a rigid, unchanging view of her own competence as a parent, as a result of which she misinterpreted the therapist's suggestions or rejected them outright.
In her final report to DCF, dated January 4, 2001, Fiorello concluded that the respondent "had not made adequate progress in forging a stronger bond with Brandon, accurately reading cues, setting limits, providing appropriate nurturance and guidance to the boys, or implementing therapist feedback." In summary, she stated, "outcomes for this course of therapy were poor."
The court also received psychological evidence from three expert witnesses. CT Page 1876
On February 28, 2000 and January 8, 2001, Dr. Robert H. Neems, Ph. D., a clinical psychologist, evaluated the respondent and her sons, and performed parent-child evaluations. In February 2000, he found the respondent very insecure, impulsive and immature. In the respondent's interaction with her sons, Neems observed that the respondent "focused on seeking gratification of her wants, is quite self-centered, has a very poor understanding of the needs of others, and will manipulate others to get what she wants." This resulted in both boys having tantrums. Although she gave the appearance of competence when discussing her children and issues of parenting, her actual competence in dealing with her children was very poor. Neems concluded that the respondent "has very serious parenting problems. These problems include a) bad judgment and poor planning, b) [inability to correctly anticipate what is likely to happen and plan accordingly,] c) overindulging the boys, d) very weak in setting limits, e) being highly intrusive, f) failing to correctly read the obvious irritation of the boys, g) persistent, irritating intrusions which precipitated temper tantrums in both boys, h) inaccurately projecting her feelings of insecurity and anger onto the boys, and i) being totally unaware of how intrusive she is and how her intrusions cause the boys' temper tantrums." (Exhibit 2, p. 9.) Neems recommended that Stanley and Brandon remain in foster care.
When Neems examined the respondent and conducted a parent-child interview on January 8, 2001, he found that the respondent had made some improvements. She was less "forcefully intrusive" and "not as clingy with the boys." She also was "[l]ess insistent in her assertion that the boys felt as she assumed that they felt." She let them work out their conflicts and praised them for positive things they did. She also tried to teach them colors and numbers. However, she still exercised "[v]ery poor judgment" and did not "correctly anticipate what will happen and then plan accordingly." She was weak in setting limits for her sons and continued to overindulge them. She remained "very inclined to be intrusive, although not in as forceful a manner" as a year earlier. She continued to project her feelings onto the boys and had a "[v]ery weak understanding of the children's developmental stage." She also continued to favor Stanley over Brandon.
In Neems' opinion, the respondent's "parenting deficits are at a very basic level and clearly impair her ability to provide a safe and nurturing environment. Her deficits would be very likely to cause long term emotional harm to her sons if they were in her full time care." He concluded that the respondent's prognosis to make significant change within a reasonable time, considering the boys' need for permanence, was not good. Accordingly, he recommended that the respondent's parental rights be terminated so that they could be free for adoption. CT Page 1877
Dr. Walter Borden, M.D., a psychiatrist, evaluated the respondent on August 7, 1996 and again on March 15, 1999. In 1996, he also performed psychological testing of the respondent.
Borden found the respondent to be an unreliable historian who greatly distorted reality and fabricated facts in order to place herself in the best possible light and to hide her problems. In his 1999 report, Borden found that the respondent suffered from "a severe mixed personality disorder to the point of substantial impairment in functioning, both in terms of taking care of herself or caring for her children. The personality disorder presents a complicated diagnostic picture with obsessive compulsive, dependent, avoidant but also antisocial features. It is probable that her mental illness involves deeper issues than personality disorder but are covered up through her massive denial. The record reflects indicators of psychosis and during this examination when her thinking processes were assessed, the findings are suggestive of an underlying thought disorder. Her denial and unreliability as a historian makes it impossible to clarify this further. Her need to present a facade of normality, to hide problems, also were reflected in the psychological test results.
"In terms of her functioning, the psychotic diagnosis appears most probable. There are issues indicating a certain amount of. street smarts and antisocial traits. . . .
"She seems to have little awareness of the emotional issues in her children, of her impact, of her role in their lives and of their emotional needs. She explains their being taken away solely in terms of their father's behaviors and has no understanding of issues involving herself. It is probable that she is well aware of the questions raised about her behavior, of her lack of prenatal care, of her not seeking medical attention when she went into premature labor and of other questions involved in taking care of her children. However, she left that entirely out of her account even when asked directly if there were any other issues aside from the children's father's violation of a restraining order. It does appear that she has consciously made that the only issue.
"In my opinion, [the respondent] is not capable of providing constructive parenting. Her ability to safely care for her minor children is substantially impaired and in view of her lack of insight and resistances, the prognosis is very poor for any change."
In his testimony before the court, Borden acknowledged that he had not seen the respondent since 1999. He modified his opinion somewhat, CT Page 1878 underscoring that the respondent was not overtly psychotic. Borden testified that the respondent's major psychological problem is post traumatic stress disorder, resulting from the sexual assaults on her, which has never been addressed by treatment. Her most disabling symptom, and the reason her prognosis is so poor, is her denial — her inability to acknowledge her mental illness. Because of this, she is not likely to accept treatment.
Dr. Howard M. Krieger, Ph. D., evaluated the respondent on January 17, 2000 and September 10, 2001. His findings were substantially different from those of Neems and Borden. In January 2000, he found that the respondent was "functioning in the borderline range of general cognitive abilities. . . . Her academic performance is quite similar to her performance on IQ tasks, which places her in the borderline range of abilities. Her personality testing presents her as a relatively emotionalwell adjusted person who tends to be shy and quite conventional. However, there is evidence of underlying anger and resentment toward authority figures which she manages to keep under fairly good control. [The respondent] has a strong desire to be involved in relationships with others, particularly with her children. . . ." (Emphasis added.)
When Krieger saw the respondent on September 10, 2001, he interviewed her and administered a psychological test. He found that she had "become angrier, and more suspicious. While the intensity of her symptoms has diminished, she continues to manifest the presence of these symptoms, albeit within the normal range. This is not a clinically significant factor, rather indicates the absence of a deepening mood disorder. [The respondent] has become more mistrustful and suspicious, a likely result of the ongoing process of her children's legal status. As she has proceeded in her attempt to follow the steps indicated to her through the court and DCF, she shows an increase in her own sense of helplessness, and a greater conviction of the role of others to affect and control her life. Her coping resources have developed positively since her last assessment, and she shows a lowered degree of stress and better ability to respond well to her current stressors. Diagnostically, the most likely description of [the respondent] is dysphoric, probably Dysthymic (300.4 DSM 4). . . ." (Exhibit A)
Krieger performed another parent-child interaction. Soon after the interaction began, Stanley became ill and, while sitting in his mother's lap, vomited on her. According to Krieger, the respondent remained calm, focused on Stanley's being ill, "and directed that she and the boys move to the bathroom and try to clean up the situation. She did this quickly, calmly, and in a manner to create less chaos both with her sons and in the office environment in general. Clean clothes were found for Stanley, and [the respondent] did the changing and cleaning in a very efficient CT Page 1879 manner, calming both boys, and maintaining Brandon's interest as well.
"Once cleaned up, [the respondent] settled her sons in a larger conference room, and offered them some coloring books, toys and blocks, which they eagerly responded to." (Exhibit B) There followed a very positive session between mother and sons. Krieger opined that "Stanley and Brandon's relationship with their mother appears to be a bonded one. . . . [T]here are no clearly pathological signs in these relationships."
Notably, at the time of his January 2000 report, Krieger did not have the benefit of background information on the respondent nor Borden's evaluations. In his report subsequent to his September 2001 evaluation of the respondent, he chose not to review DCF's records nor the data or conclusions contained in Dr. Neems' February 28, 2000 report. Krieger believed his own evaluation of the respondent would be more unbiased if he did not consider such information. He did review the "historical and preparatory information" contained in Neems' report and was provided some background information from the children's foster parents and their worker at Jewish Family Services.
"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [she] can assume a responsible position in [her] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. . . ." (Citations omitted; internal quotation marks omitted.) Inre Sheila J., supra, 62 Conn. App. 480.
"The psychological testimony from professionals is rightly accorded great weight in termination proceedings." (Internal quotation marks omitted.) In re John G., 56 Conn. App. 12, 24, 740 A.2d 496 (1999). Here, however, the observations and conclusions of the various experts differ. "The probative force of conflicting evidence is for the trier to determine." In re Ashley E., 62 Conn. App. 307, 316, 771 A.2d 160, cert. denied, 256 Conn. 910, 772 A.2d 601 (2001). The trier is the judge of the credibility of all the witness, lay and expert, and the weight to be given their testimony. In re Tricia A., 55 Conn. App. 111, 114,737 A.2d 974 (1999); see also Knoblaugh v. Marshall, 64 Conn. App. 32, CT Page 1880 39, 779 A.2d 218, cert. denied, 258 Conn. 916, 782 A.2d 1243 (2001); Inre Savanna M., 55 Conn. App. 807, 816, 740 A.2d 484 (1999).
The court acknowledges some inconsistency in the evidence. Moreover, it is difficult to fathom how Thomaston could have been so sanguine in its observations of the respondent throughout 1999 if she had not, indeed, been making substantial progress and not merely performing for the benefit of her counselors. Nonetheless, from the evidence as a whole, a clear picture of the respondent emerges as a person who is not well-tethered to reality for long periods of time or when she is left untutored or unsupervised. While it must be acknowledged that the respondent responded remarkably well when Stanley became sick during her interaction study with Krieger in September 2001, this was a single episode and occurred while an evaluator was present. As evidenced by her care of Brandon until November 1998 and her performance at Thomaston in 1998 and as Borden observed, the respondent is able to maintain a "facade of normality" and appears to function well for brief periods. However, as Thomaston later observed, her perceptions do not match reality. This is not a case of a parent who has simply not been a "model parent." Cf. Inre Baby Girl B., 224 Conn. 263, 280-81, 618 A.2d 1 (1992). Rather, the court credits Borden's finding that the respondent has a severe personality disorder to the point of substantial impairment and accepts Neems' conclusion that the respondent's parenting deficiencies are at a basic level that would cause long term emotional harm to the children if they were in her care. This is especially true given the tender age and needs of the children.
The respondent's personality disorder, or psychiatric condition, is superimposed on an intellectual ability that is borderline. She refuses to acknowledge her psychological problems which, as Borden opined, prevents her from truly accepting the psychological or psychiatric treatment necessary for her to improve.
"Termination has been consistently recognized as being in the best interest of the child when the parent has a mental deficiency or illness which renders her unable to provide the child with necessary care." In reNicolina T., 9 Conn. App. 598, 605, 520 A.2d 639, cert. denied,203 Conn. 804, 525 A.2d 519 (1987); see also In re Juvenile Appeal(83-BC), 189 Conn. 66, 78-79, 454 A.2d 1262 (1983) (noting that legislature may authorize the termination of parental rights without a finding of parental fault); In re Antony B., 54 Conn. App. 463, 473,735 A.2d 893 (1999) (same). Our Supreme Court has held that a parent's rights can be terminated because of her mental condition, even if she is not at fault. "[I]n weighing the interests of the child against the hardship imposed on the parent, the legislature may properly strike the balance at the point where the mental . . . deficiency, even though CT Page 1881 involving no fault, is so great as to render the parent incapable of measuring up to the child's needs as those are delineated in [§17a-112 (j)]." In re Jessica S., 51 Conn. App. 667, 673-74, 723 A.2d 356, cert. denied, 251 Conn. 901, 738 A.2d 1090 (1999). By the time of trial, DCF had been working with the respondent toward rehabilitation for two and a half years. She had not made sufficient progress to be a caretaker of her sons and it is not reasonably foreseeable that she will be able to care for them at any time in the future. See In re Eden F., 250 Conn. 674,707, 741 A.2d 873, reargument en banc denied, 251 Conn. 924, 742 A.2d 364
(1999) (trial court's finding, based on psychological evidence, that, in light of the serious and chronic nature of mother's mental illness, her future prospects for assuming a responsible parenting role for her children were bleak, upheld). By clear and convincing evidence the court finds that the respondent has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of her children, Stanley and Brandon, both of whom have been found to be neglected, that she could assume a responsible position in their lives.
 B.
The second adjudicatory ground based on which DCF seeks to terminate the respondent's parental rights is that there is no ongoing parent-child relationship between the respondent and her two sons. General Statutes § 17a-112 (j)(3)(D) "provides that the court may grant a petition to terminate parental rights if it finds by clear and convincing evidence that `there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.
"This part of the statute requires the trial court to undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop . . . In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent.
Feelings for the natural parent connote feelings of a positive nature only." (Citations omitted; internal quotation marks omitted.) In reJonathan G., 63 Conn. App. 516, 525, 777 A.2d 695 (2001). "As the Supreme CT Page 1882 Court expressed in In re Valerie D., [223 Conn. 492, 613 A.2d 748
(1992),] however, in cases involving the development of a parent-child relationship in the earliest stages of the child's life, we also must be mindful of the positive feelings of the parent toward the child. In reBaby Girl B., 224 Conn. 263, 301, 618 A.2d 1 (1992). We further recognize that `the evidence regarding the quality of [a parent's] relationship with [a] child must be reviewed in the light of the [parent's] limited access to visitation at the time of the petition.' Id." In re AlexanderC., 67 Conn. App. 417, 425, 787 A.2d 608 (2001). In addition, the quality of a parent's relationship with a child must be judged in the context of the generally understood obligations of parenthood, including "the expression of love and affection for the child, and the expression of personal concern over the health, education and general well-being of the child. . . . A parent's interest in [her] child must not merely be sporadic in nature, but must exist on a consistent and continuing basis." (Citation omitted; internal quotation marks omitted.) Id., 426.
The record does not support a finding that there is no ongoing parent-child relationship with either child. The respondent has been consistent in visiting her children, has been intensely interested in their welfare, and has brought them food and gifts. The mother is often effusive in her display of love, especially for Stanley. Indeed, the record is replete with evidence of the mutual affection between the respondent and Stanley. There is no question that Stanley loves his mother and that his mother loves him.
The respondent favors Stanley over Brandon. She also has an emotional bond to Stanley that is stronger than that with Brandon. The respondent also tends to ascribe negative qualities to Brandon. Not surprisingly, Brandon at times does not enjoy his visits with the respondent as much as Stanley does.
As of the adjudicatory date, Brandon was only two and a half years old. "When the issue is the relationship of a parent with a very young child . . . the inquiry must focus, not on the feelings of the infant, but on the positive feelings of the natural parent." (Internal quotation marks omitted.) In re Baby Girl B., supra, 224 Conn. 301. The court cannot find that when the respondent visited she did not come to visit with Brandon as well as Stanley, nor that when she brought food for her sons she did not bring it for Brandon as well as Stanley. True, she brought more presents for Stanley than for Brandon and she was more affectionate with Stanley. However, the evidence proves at best a troubled relationship with Brandon. "It is not enough for the [DCF] commissioner to show a troubled relationship. . . ." In re Rayna M.,13 Conn. App. 23, 24, 534 A.2d 897 (1987). The evidence falls short of clear and convincing proof of no ongoing parent child relationship. The CT Page 1883 court holds that DCF has failed to prove this ground of the petition.
 III
"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interests of the child." (Internal quotation marks omitted.) In re Ashley E., supra, 62 Conn. App. 315. "In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [§ 17a-112 (k)]." (Internal quotation marks omitted.) In re Deana E.,61 Conn. App. 185, 190, 763 A.2d 37 (2000).
 B. Mandatory Findings 1. Finding regarding the timeliness, nature and extent of servicesoffered, provided, and made available to the parent and the child by achild-placing agency to facilitate the reunion of the child with theparent.
As discussed in part I, DCF timely offered extensive services appropriate to the deficiencies of the respondent that required rehabilitation.
2. Finding regarding whether DCF has made reasonable efforts to reunitethe family pursuant to the Federal Child Welfare Act of 1980, asamended.
DCF made reasonable efforts to rehabilitate the family.
3. Finding regarding the terms of any applicable court order enteredinto and agreed upon by any individual or child-placing agency and theparent, and the extent to which all parties have fulfilled theirobligations under such order.
The court's expectations required the respondent to: keep all appointments set by or with DCF and to keep her whereabouts known to DCF; not to engage in domestic violence; cooperate with Visiting Nurse Association (VNA) services; participate in parenting counseling and cooperate with VNA services; participate in parenting counseling and cooperate with a parent aide and follow the aide's recommendations; participate in individual counseling by continuing at Susan B. Anthony; follow recommendations of Charlotte Hungerford psychiatric evaluation; CT Page 1884 meet both children's medical needs; follow all recommendations of the University of Connecticut's program; secure and maintain adequate housing and income; do not engage in substance abuse; have no involvement in the criminal justice system; sign releases for DCF and court use.
After the children were removed from the respondent's care, the respondent substantially complied with these orders, although on February 9, 2000, she committed criminal impersonation, in violation of General Statutes § 53a-130, for which she was convicted on August 17, 2000. Also, on July 12, 2001, the respondent was arrested for forgery in the third degree, in violation of General Statutes § 53a-140. That charge is pending. The respondent's criminal record, however, is not material to the court's disposition of the petition. So too, however, while "[p]ersonal rehabilitation . . . is to be determined, in part, by compliance with . . . specific steps, which give the parent fair warning of what is required"; In re Shyliesh H., 56 Conn. App. 167, 179,743 A.2d 165 (1999): it is settled that parental rights may be terminated notwithstanding a parent's compliance with the court's expectations. Inre Megan M., 24 Conn. App. 338, 341 588 A.2d 239 (1991); In rePassionique T., 44 Conn. Sup. 551, 564, 695 A.2d 1107 (1996). "[T]he ultimate issue . . . [is] whether the respondent was better able to resume the responsibilities of parenting at the time of filing the termination petition than [she] had been at the time of the children's commitment." In re Hector L., 53 Conn. App. 359, 367, 730 A.2d 106
(1999). As the court has found in part IIA, the respondent has "not made sufficient progress to be a caretaker of her sons and it is not reasonably foreseeable that she will be able to care for them in the future."
4. Finding regarding the feelings and emotional ties of the child withrespect to the child's parents, any guardian of the child's person andany person who has exercised physical care, custody or control of thechild for at least one year and with whom the child has developedsignificant emotional ties.
Stanley loves his mother and has a close emotional bond to her. Brandon does not have such strong feelings or such a strong bond to his mother. Both boys are closely bonded to their foster parents who clearly are their psychological parents.[5] Unfortunately, there is no evidence that their foster parents will adopt them.
5. Finding regarding the age of the child.
Stanley is four years old. Brandon is three and a half years old.
6. Finding regarding the efforts the parent has made to adjust suchCT Page 1885parent's circumstances, conduct or conditions to make it in the bestinterest of the child to return the child to the parent's home in theforeseeable future, including, but not limited to: (A) the extent towhich the parent has maintained contact with the child as part of aneffort to reunite the child with the parent; provided the court may giveweight to incidental visitations, communications or contributions, and(B) the maintenance of regular contact or communication with the guardianor other custodian of the child.
As discussed supra, the respondent has consistently visited with her children, has been intensely interested in their welfare, and has brought them food and gifts. Her parenting ability also has improved marginally. She is less forcefully intrusive in the children's play than she was previously. She also is acutely aware of safety issues.
However, the respondent suffers from and fails to acknowledge a serious psychiatric or personality disorder, superimposed on a borderline intellect, that causes her perceptions to conflict with reality. This perception results in her having parenting deficiencies at a basic level that would cause long term emotional harm to the children if they were in her care, given their age and needs. These parenting deficiencies include poor judgment, an inability to anticipate and plan, and an inability to set limits and enforce them. She also tends to ascribe her own feelings to her sons, and is unable to sufficiently appreciate their emotional needs. The parenting deficiencies generally manifest themselves when the respondent is not closely monitored and tutored. In sum, because of these deficiencies, her parenting ability is not substantially improved from what it was in 1998 when those deficiencies threatened the welfare of both children and the physical health of Brandon.
7. Finding regarding the extent to which a parent has been preventedfrom maintaining a meaningful relationship with the child by theunreasonable act or conduct of the other parent of the child, or theunreasonable act of any other person or by the economic circumstances ofthe parent.
The respondent has not been prevented from maintaining a meaningful relationship with her children by the unreasonable act or conduct of the children's father, or the unreasonable act of any other person or by her economic circumstances.
 B.
Although, when determining whether to grant a petition to terminate parental rights, the court is statutorily mandated to consider seven factors; General Statutes (Rev. 1999) § 17a-112 (d), now § CT Page 188617a-112 (k); In re Tyscheicka H., 61 Conn. App. 19, 26, 762 A.2d 916
(2000); "[t]he seven factors . . . serve simply as guidelines to the court and are not statutory prerequisites that need to be proven before termination can be ordered." In re Quanitra M., 60 Conn. App. 96, 104,758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909 (2000). "The trial court is vested with broad discretion in determining what is in the child's best interests. . . . Conducting a best interest analysis is . . . purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations." (Citations omitted; internal quotation marks omitted.) In re Alissa N., 56 Conn. App. 203, 208,742 A.2d 415 (1999), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000). What is clear, however, is that the focus must be on what is best for the child, not on what is best for the parent. Cf. In re Bruce R.,234 Conn. 194, 206, 662 A.2d 107 (1995) (discussing best interests in the context of a consenting parent) "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Internal quotation marks omitted.) In re Shyina B., 58 Conn. App. 159, 167, 752 A.2d 1139 (2000). "In addition, the genetic bond shared by a biological parent and . . . her child, although not determinative of the issue of the best interest of the child, is certainly a factor to consider. . . ." (Internal quotation marks omitted.) In re Savanna M., 55 Conn. App. 807, 816,740 A.2d 484 (1999).
The following additional facts are found. Subsequent to the filing of the petition, Stanley has not wanted to leave his foster home to attend visits with the respondent. After visits he has exhibited aggression toward Brandon, separation problems and tantrums. He has tended to regress from his developmental milestones.
Before visits with the respondent, Brandon has tended to become aggressive and engage in tantrums, refusing to travel to the visit. After the visit he is aggressive with Stanley and his foster family. Both children continued to receive special education services at the time of trial.
As Krieger stated, Stanley and Brandon, who have been in foster care for over three years, need permanency now. The respondent is not able to care for them now and her ultimate rehabilitation is not reasonably foreseeable at any time in the future. Although Stanley loves his mother and is bonded to her, both he and Brandon are emotionally bonded to their foster parents, who are their psychological parents. The emotional benefit they derive from their period visits with the respondent is not substantial and is clearly outweighed by their pressing need for stability. CT Page 1887
As stated supra, there was no evidence that the children's foster parents will adopt them. "Although subsequent adoption is the preferred outcome for a child whose biological parents have had their parental rights terminated; In re Juvenile Appeal (83-BC), 189 Conn. 66, 79,454 A.2d 1262 (1983); accord In re Baby Girl B., [supra 224 Conn. 274]; it is not a necessary prerequisite for the termination of parental rights. While long-term stability is critical to a child's future health and development; In re Romance M., [229 Conn. 345, 356, 641 A.2d 378
(1994)]; adoption provides only one option for obtaining such stability."In re Eden F., supra, 250 Conn. 709. Here, the respondent's continued contact with the children will, in the long-term, cause them more harm than it will confer benefit. DCF's plan is to have the children adopted. By clear and convincing evidence, the court finds that it is in the children's best interests that the respondent's parental rights be terminated.
The petition is granted. The court terminates the respondent's parental rights with respect to both Stanley and Brandon. The foster parents shall be given the first opportunity to adopt the children. The Commissioner of DCF is appointed statutory parent for Stanley and Brandon for the purpose of securing a permanent adoptive family for them. The commissioner shall file with this court no later than thirty (30) days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
Dated at Middletown this 19 day of February, 2002.
BY THE COURT
Bruce L. Levin Judge of the Superior Court