832

# IN RE DEVAUN J.*
## (AC 28502)

Bishop, Lavine and Borden, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued April 25—officially released August 26, 2008

*Gail A. Bedoukian,* for the appellant (respondent mother).

*Colleen Broderick,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*Susan Rothenberg,* for the minor child.

*Opinion*

BORDEN, J. The respondent mother of Devaun J. appeals from the judgment of the trial court terminating

her parental rights.[1] The respondent claims that the court improperly: (1) failed to consider her statutory choice of a voluntary termination and open adoption; (2) determined that she had not achieved a sufficient degree of personal rehabilitation and that there was no ongoing parent-child relationship; and (3) considered certain witnesses as expert witnesses. The respondent also claims that the lateness of a postjudgment report should invalidate the judgment of termination. We affirm the judgment of the trial court.

On April 11, 2002, the petitioner, the commissioner of children and families, took custody of the child pursuant to a ninety-six hour hold[2] and the next day filed a motion for temporary custody and a neglect petition. The court granted the motion, on the ground that the child was in immediate physical danger, and sustained the order on April 17, 2002. On May 27, 2003, after a contested hearing, the court adjudicated the child neglected and committed him to the custody of the petitioner. On March 25, 2004, the court, *Black, J.*, determined that further efforts at reunification of the child with the respondent were not appropriate. No appeal was filed from the neglect judgment or from the determination that further efforts at reunification were not appropriate.[3]

In May, 2004, the petitioner filed this termination petition on two grounds: (1) the child had previously

---

[1] Although the court also terminated the parental rights of the father of the child, no appeal was filed on his behalf. Therefore, we refer to the respondent mother as the respondent.

[2] See General Statutes § 17a-101g.

[3] "[A] decision following a hearing pursuant to § 46b-129 (k), extending commitment and finding that further reunification efforts are not appropriate is an immediately appealable final judgment, and the issue of reunification cannot be raised as a collateral attack on a judgment terminating parental rights. In re Victoria B., 79 Conn. App. 245, 259 n.15, 829 A.2d 855 (2003)." (Internal quotation marks omitted.) *In re Javon R.*, 85 Conn. App. 765, 770, 858 A.2d 887 (2004).

been adjudicated neglected, and the respondent had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the child's age and needs, she could assume a responsible position in his life, as provided in General Statutes § 17a-112 (j) (3) (B);[4] and (2) there was no ongoing parent-child relationship between them, as provided in § 17a-112 (j) (3) (D).[5] The termination trial took place on July 10 and 24, 2006, and the court rendered its decision on August 8, 2006, granting the termination petition on both grounds. Thereafter, the respondent moved to open the judgment. The court denied the motion, and this appeal followed.

The court found the following facts. On April 12, 2002, the child, then age five, was removed from the respondent's care pursuant to the order of temporary custody and in November, 2002, was placed in foster care with his current foster mother, Fanny J. From April, 2002, to November, 2003, the respondent visited with the child twice, each time supervised by the department of children and families (department). During that time, the child was diagnosed as suffering from posttraumatic stress disorder and expressive disorder with expressive receptive language deficits (nonverbal), all

[4] General Statutes § 17a-112 (j) (3) (B) provides in relevant part: "[T]he child . . . has been found by the Superior Court . . . to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[5] General Statutes § 17a-112 (j) (3) (D) provides in relevant part: "[T]here is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child . . . ."

of which produced aggressive behavior. He experienced flashbacks to his earlier childhood when the respondent disciplined him by regularly beating him with a belt, causing him to engage in violent outbursts against animals and his toys. A mere touch would set off a violent response. This led to three psychiatric hospitalizations and dictated the need for a highly trained therapeutic foster home, which was met when he was placed with Fanny J. From December, 2003, through February, 2004, the respondent visited with the child twice per month. Then, visitation ceased for another two months when the respondent went to Haiti.

The court further found that in October, 2003, and April, 2004, the child's therapist recommended that all visitations with the respondent cease because they caused instability and deterioration of the child's condition. The child saw the visits as a threat to his security and a risk of disruption of the permanency of his placement with Fanny J. Accordingly, the court suspended visitation on April 15, 2004, until June 3, 2004, when it reinstated visitation at the department's discretion. Visits occurred irregularly until May, 2005, when all visitation ceased on the recommendation of a clinical social worker who had been engaged by the respondent to supervise visits. She concluded that the respondent did not understand the child's needs and was incapable or unwilling to achieve the necessary level of understanding. The court found strong evidence of this in the fact that for a period of eighteen months, the respondent had chosen to visit only twice because she claimed that the visits, which were supervised by the department, brought her too close to the petitioner, whom she did not trust, and brought back unpleasant memories of her experiences with the petitioner. Thus, at the time of the trial on the termination petition, the respondent had not visited with the child in more than one year.

The court found further that the respondent has significant emotional problems that interfere with her parenting. She is unable to settle down and develop stable relationships for herself and her children, including the child at issue. She is unreliable; she has a narcissistic personality; she denies her neglect of the child; she fails to recognize his need for support services and the need for remedial measures to effect a reunification with the child; she has no understanding of his problems, limitations and psychological needs; and she does not believe that he needs medication. She is likely to place her needs ahead of his, and it is unclear that she would ever be able to gain the proper understanding of the child's needs.

On the basis of all of this evidence and these findings, the court found that it was clearly and convincingly established that the respondent has not, in the more than four years that the child has been in the petitioner's custody, and will not, in the foreseeable future, gain such a level of rehabilitation as to satisfy the requirements of the statute. Thus, the court found that the petitioner had established the first ground for termination.

The court then turned to the second ground, namely, that there is no ongoing parent-child relationship, meaning the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and that to allow further time for the establishment or reestablishment of such a relationship would be detrimental to the child's best interest. In this respect, the court found the following facts.

The child was, at the time of the decision, nine years old and had not been in the respondent's care for more than four years. The child had not seen the respondent in more than one year and only twice from April, 2002,

to November, 2003. During that period, almost half of the child's life, he developed a loving, nurturing, dependent relationship with Fanny J., who is devoted to his well-being and meets his specialized needs. Introduction of reunification efforts into his life would cause him to relive the physical abuse he suffered at the respondent's hands in his early childhood. Before he was placed in the petitioner's custody, the respondent's parenting caused at least three psychiatric hospitalizations for violent, uncontrolled behavior. The child has tried to repress the memory of his early years with the respondent, does not remember her name and is reluctant to recapture memories of his early childhood because they make him sad. Revival of these memories is not in his best interest. Whatever relationship he once had with the respondent no longer exists, and she will never be in a position to establish or reestablish such a relationship.

The court then addressed the respondent's contention that the court deny termination in favor of a permanency plan of long-term foster care with Fanny J. so that the respondent could visit with the child from time to time and remain a part of his life. The court specifically found that "such a result would be severely detrimental to [the child's] best interest and is therefore rejected."

The court then made all of the specific findings required by § 17a-112 (k). The court concluded by specifically finding by clear and convincing evidence that both statutory grounds alleged had been proven and that it was in the best interest of the child that the respondent's parental rights be terminated. The court appointed the petitioner as the child's statutory parent.

I

The respondent first claims that the court improperly failed to consider her statutory choice of a voluntary

termination of her parental rights coupled with an open adoption, as provided in § 17a-112 (b).[6]

The respondent's claim arises out of the following procedural context. The court filed its memorandum of decision on August 8, 2006. On October 18, 2006, the respondent filed a "Revised Motion To Open The Judgment,"[7] in which she raised, for the first time, the claim that she was entitled to consideration of an open adoption pursuant to the statute. Specifically, she alleged that "it was only during testimony that the foster mother stated for the first time that she would 'consider adopting' if the [c]ourt 'were to free [the child] up for adoption. . . . As a result, the [respondent] never had the opportunity to voluntarily terminate her rights. Once the foster mother stated she was willing to adopt, the trial should have been suspended." (Citation omitted.) At the subsequent hearing on the motion, the respondent reiterated that when, on the first day of trial, namely, July 10, 2006, the foster mother indicated that she was willing to adopt the child, "the trial probably should have been suspended at that time" because of the open adoption statute.

---

[6] General Statutes § 17-112 (b) provides in relevant part: "Either or both birth parents and an intended adoptive parent may enter into a cooperative postadoption agreement regarding communication or contact between either or both birth parents and the adopted child. Such an agreement may be entered into if: (1) The child is in the custody of the Department of Children and Families; (2) an order terminating parental rights has not yet been entered; and (3) either or both birth parents agree to a voluntary termination of parental rights, including an agreement in a case which began as an involuntary termination of parental rights. The postadoption agreement shall be applicable only to a birth parent who is a party to the agreement. Such agreement shall be in addition to those under common law. Counsel for the child and any guardian ad litem for the child may be heard on the proposed cooperative postadoption agreement. There shall be no presumption of communication or contact between the birth parents and an intended adoptive parent in the absence of a cooperative postadoption agreement."

[7] The respondent had originally filed a "Motion To Reopen Judgment" on September 18, 2006.

Specifically, the respondent claims that it was plain error for the court to overlook the statute both before it rendered its decision and when she brought it to the court's attention in her revised motion to open the judgment. She also argues that "once the court heard evidence that the foster mother was willing to adopt for the first time at trial, the trial court had a duty to suspend the involuntary termination hearing to allow the [respondent] an opportunity to discuss with the foster mother the possibility of working out an open adoption agreement and also to consider voluntarily terminating her rights with an agreement in place." We reject this claim.

First, the respondent's position, namely, that she had no opportunity to approach Fanny J. about an open adoption, is flawed factually. When Fanny J. indicated on July 10, 2006, that she was willing to adopt the child, the respondent had ample opportunity at that time, and until August 8, 2006, when the court rendered its decision, to approach Fanny J. about the possibility of an open adoption. Additionally, a court-ordered psychological report drafted by David M. Mantell, a clinical psychologist, states that the mother reported during an interview that Mantell conducted in October, 2004, that the foster mother had indicated that she wanted to adopt the child. In the same report, Mantell specifically suggested that this might be an appropriate case for an open adoption agreement. Finally, the respondent testified about an open adoption agreement during direct examination. During that testimony, the respondent indicated that she was not willing to consider termination with an open adoption agreement and further indicated that she and Fanny J. had already discussed the option but had been unable to reach an agreement.[8]

---

[8] The transcript records the following relevant testimony by the respondent:

"Q. Why are you fighting this termination? Why don't we start with that.

Second, the respondent's legal position is flawed. There is nothing in either the language or the purpose of the statute to suggest, as the respondent urges, that the court is under an independent obligation to suspend, sua sponte, a contested termination proceeding that

"A. I am fighting this termination because I extremely believe that my relationship with Devaun should not be excluded.

"Q. Are you looking to remove Devaun from [Fanny J.'s] house?

"A. No way. I wouldn't seek to do that because I have been told that he is fine where he is at.

"Q. So, are you in agreement that it may be in Devaun's best interest at this time to remain in foster care with Fanny J.?

"A. That's correct.

"Q. Do you feel that she is meeting his needs?

"A. Yes. I conversed with her several times. She appeared to be a wonderful person. She is not an opponent. She is, in fact, caring for my child, and I think she's doing a good job.

"Q. Why haven't you entered into some sort of open adoption agreement with the family?

"A. There is really no communication between [Fanny J.] and [the petitioner] and I. We only converse when we accidentally meet in the store, just brief conversation.

"Q. Well, let me rephrase that. If you knew [Fanny J.] wanted to adopt Devaun, would you consider an open adoption arrangement with Fanny?

"A. Not knowing that my rights as a mother were going to be terminated, I wouldn't go forward with it. *I wouldn't agree to it if my rights will be terminated. That's the purpose of me fighting this. I don't want my rights to be terminated.* I—

"Q. But, no. My question isn't why are we fighting the termination. My question is, if [Fanny J.] had come forward as an adoptive resource, weren't you going to consider agreeing to some sort of open adoption where [she] adopted Devaun?

"A. If she told me she was going to adopt, if I knew if I was going to be able to lay out rights knowing that he is still my son with her—

"Q. Okay.

"A. —and be peace of mind and be able to move on with life.

"Q. And you weren't offered the option of an open adoption because Fanny was not willing to commit to adopting. Correct?

"A. That's correct. She told me that she don't think she is ready for it.

"Q. So, do you agree with the therapist that it would be in Devaun's best interest to stay where he is at the present time?

"A. I agree that he remains there because I feel very confident [about the arrangements] because they seem like they are doing the job because they enjoy it, and they have told me that he requires a lot of needs." (Emphasis added.)

has been pending for more than two years and to invoke the possibility of a voluntary termination and to open adoption simply because the foster parent has indicated a willingness to adopt following the termination that is sought by the petitioner. The statute places no such burden on the court.

## II

The respondent next claims that the court improperly found that the petitioner had proven by clear and convincing evidence that (1) the respondent had not achieved rehabilitation and (2) there was no ongoing parent-child relationship. Thus, the respondent claims that the court's findings in these two respects were clearly erroneous. We disagree.

The respondent does not claim that the court applied an improper legal standard to either of these critical factual issues, and the respondent agrees that our scope of review is governed by the clearly erroneous standard. See *In re Drew F.*, 47 Conn. App. 124, 127–28, 702 A.2d 647 (1997). Our thorough review of the court's thoughtful and comprehensive memorandum of decision and of the trial record fully convinces us that the court's findings were more than amply supported by the evidence.

## III

The respondent next claims that "the trial court improperly decided that the petitioner's designated fact witnesses were experts" and that "[t]he petitioner failed to disclose the names of its experts prior to trial or canvass the qualification of its witnesses at trial." Therefore, the respondent claims, "any facts known and opinions held by the petitioner's witnesses should be discounted as credible or admissible evidence." This claim requires little discussion. There was no objection at any time in the trial court to the testimony or reports

of any of these witnesses. Consequently, the court was fully justified in taking this evidence into account in making its findings.

## IV

The respondent's final claim is that the judgment of termination should be reversed because the postjudgment report required by § 17a-112 (o)[9] was filed late. It is undisputed that the report was filed ninety days after the judgment, rather than thirty days, as required by the statute. That delay had no effect, however, on the validity of the judgment of termination. Section 17a-112 (o), formerly § 17a-112 (i), was adopted to take advantage of federal funding regarding monitoring of

---

[9] General Statutes § 17a-112 (o) provides: "In the case where termination of parental rights is granted, the guardian of the person or statutory parent shall report to the court not later than thirty days after the date judgment is entered on a case plan, as defined by the federal Adoption Assistance and Child Welfare Act of 1980, for the child which shall include measurable objectives and time schedules. At least every three months thereafter, such guardian or statutory parent shall make a report to the court on the progress made on implementation of the plan. The court may convene a hearing upon the filing of a report and shall convene and conduct a permanency hearing pursuant to subsection (k) of [General Statutes §] 46b-129 for the purpose of reviewing the permanency plan for the child no more than twelve months from the date judgment is entered or from the date of the last permanency hearing held pursuant to subsection (k) of section 46b-129, whichever is earlier, and at least once a year thereafter while the child remains in the custody of the Commissioner of Children and Families. For children where the commissioner has determined that adoption is appropriate, the report on the implementation of the plan shall include a description of the reasonable efforts the department is taking to promote and expedite the adoptive placement and to finalize the adoption of the child, including documentation of child specific recruitment efforts. At such hearing, the court shall determine whether the department has made reasonable efforts to achieve the permanency plan. If the court determines that the department has not made reasonable efforts to place a child in an adoptive placement or that reasonable efforts have not resulted in the placement of the child, the court may order the Department of Children and Families, within available appropriations, to contract with a child-placing agency to arrange for the adoption of the child. The department, as statutory parent, shall continue to provide care and services for the child while a child-placing agency is arranging for the adoption of the child."

children in foster care. *In re Baby Girl B.*, 224 Conn. 263, 289, 618 A.2d 1 (1992). It has no bearing on the court's findings regarding termination of parental rights. *In re Eden F.*, 250 Conn. 674, 693, 741 A.2d 873 (1999). Therefore, this claim fails.

The judgment is affirmed.

In this opinion the other judges concurred.

